

# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

CHRISTOPHER HANSHAW,     )
                                   )
         Appellant,     )
                                   )
v.                                 )    WD86389
                                   )
CROWN EQUIPMENT CORP., ET AL, )    Filed: April 1, 2025
                                   )
         Respondent.     )

### Appeal from the Circuit Court of Jackson County
### The Honorable Joel P. Fahnestock, Judge

**Before the Court En Banc:** Anthony Rex Gabbert, C.J., and
Lisa White Hardwick, Alok Ahuja, Mark D. Pfeiffer, Karen King Mitchell,
Cynthia L. Martin, Gary D. Witt, Edward R. Ardini, Jr.,
Thomas N. Chapman, W. Douglas Thomson, and Janet Sutton, JJ.

Christopher Hanshaw was involved in a forklift accident in August 2016, which resulted in the amputation of his left leg below the knee. Hanshaw sued the manufacturer of the forklift, Crown Equipment Corporation, in the Circuit Court of Jackson County. Hanshaw alleged that Crown's forklift was defectively designed. Hanshaw retained an expert witness, who opined that the forklift was unreasonably dangerous because it lacked a door which would have prevented Hanshaw's leg from exiting the forklift's operator compartment, and would thus have prevented his injury. The circuit court granted Crown's motion to exclude Hanshaw's expert. The court found that Hanshaw's expert was not sufficiently

qualified, and that his opinions were not reliable. Based on its exclusion of Hanshaw's expert, the court then granted Crown's motion for summary judgment on Hanshaw's negligence and strictly liability design defect claims.

Hanshaw appeals. We conclude that Hanshaw's proffered expert was sufficiently qualified, and that his opinions were reliably based on his education, experience, and analysis of the evidence in this case. We accordingly reverse the circuit court's order excluding Hanshaw's expert from testifying, as well as its grant of summary judgment to Crown based on the exclusion order. The case is remanded to the circuit court for further proceedings on Hanshaw's product defect claims.

## Factual Background

In August 2016, Hanshaw was employed by Valu Merchandisers, a subsidiary of Associated Wholesale Grocers, in Fort Scott, Kansas. He worked in a warehouse.

On August 25, 2016, Hanshaw was operating a Crown RC5500 stand-up forklift. The RC5500 is a "side-stance" forklift, in which the operator stands facing to the left, perpendicular to the direction of travel. Because of this side-stance orientation, the forklift's operator can view both the front and back of the forklift with a turn of the head, whether the forklift is traveling with the "forks forward," or with the "forks trailing" (*i.e.*, the "reverse" direction).

The operator compartment of Crown's forklift is enclosed on three sides, but is open toward the rear of the forklift, where the operator's left leg is positioned. Although Crown had previously supplied Ford Motor Company with side-stance forklifts with a door fully enclosing the operator compartment, the

forklift Hanshaw was operating was not equipped with any type of door on its rear-facing side. Crown contends that the addition of a rear door on the forklift would increase the risk of injury, because a door would prevent the forklift's operator from quickly exiting from the operator compartment in the event the forklift were to tip over, or fall off a loading dock (what are known as "stability" accidents).

Hanshaw testified that his accident occurred on August 25, 2016, while he was operating a Crown RC5500 forklift in the forks-trailing direction. He testified that he attempted to stop the forklift by lifting his left foot off a "dead man's" brake pedal on the floor of the operator compartment. (While Hanshaw described this maneuver as "plugging," "plugging" is a different method of slowing or stopping a forklift.) Hanshaw alleged that the forklift did not respond to his actions, and struck a metal pole. As the forklift was traveling, Hanshaw's left leg came out of the operator compartment, and his left foot was crushed between the forklift and the pole. As a result of his injuries, Hanshaw's left leg was amputated below the knee.

In August 2018, Hanshaw filed suit in the Circuit Court of Jackson County against Associated Wholesale Grocers, Crown, and the distributors of the forklift. (Hanshaw voluntarily dismissed his claims against Associated Wholesale Grocers and the forklift's distributors, and they are not involved in this appeal.) The circuit court granted Hanshaw leave to file a First Amended Petition in March 2020.

Hanshaw's First Amended Petition alleged that Crown negligently designed the forklift, and had negligently failed to warn users of the forklift's dangers. He

also asserted strict liability claims alleging that the forklift was defectively designed and manufactured, and that Crown had failed to adequately warn users. Hanshaw sought to recover both compensatory and punitive damages.

To support his design defect and failure to warn claims, Hanshaw retained Expert.[1] Expert opined that Crown's forklift was negligently designed and unreasonably dangerous, because it failed to include a door to fully enclose the operator compartment. Expert also opined that Crown should not sell its stand-up side-stance forklifts for general warehousing uses, but should instead offer its customers other types of material handling equipment. Finally, Expert opined that Crown should add a rear bumper to its stand-up forklifts. Expert did not proffer any opinions relating to the adequacy of the warnings provided with the forklift.

Hanshaw filed a motion to apply Missouri damages law, and Kansas liability law, to the claims asserted in his petition. The circuit court granted that motion in December 2022, and that ruling is not challenged on appeal.

On December 19, 2022, Crown filed a motion for summary judgment, and simultaneously filed a motion to exclude Expert's testimony. Crown's exclusion motion argued that Expert is not qualified to provide any opinion relating to the adequacy of the design of Crown's forklifts, and that Expert's opinions are not reliable. Crown's motion for summary judgment contended that, because of "the complex mechanical nature of the forklift and its design components," expert

---

[1]     Section 509.520.1, RSMo Cum. Supp. 2024, provides that "any judgments or orders issued by the court . . . shall not include the following confidential and personal identifying information: . . . (5) Witness information, including the name, address, and other contact information of the witness." As required by the statute, this opinion does not identify Hanshaw's retained expert by name.

4

testimony was necessary to support Hanshaw's design defect claims.  Crown argued that, if Expert's opinions were excluded, then it was entitled to summary judgment on the merits of Hanshaw's claims.  Crown's summary judgment motion separately argued that, even if Hanshaw could otherwise establish the existence of triable issues on his design defect claims, Crown was entitled to summary judgment concerning Hanshaw's prayer for punitive damages.

The circuit court granted Crown's motion to exclude Expert's testimony in an order entered on June 5, 2023.  In finding Expert's testimony to be inadmissible, the circuit court relied heavily on an unpublished federal district court decision excluding Expert's opinions, which had been issued thirteen years earlier in another products liability case involving a forklift.  *Newell Rubbermaid, Inc. v. Raymond Corp.*, No. 5:08CV2632, 2010 WL 2643417 (N.D. Ohio July 1, 2010).  With respect to Expert's qualifications, the circuit court noted that,

> [s]ince the *Newell* case, [Expert] obtained a license to operate a forklift, but still does not have extensive experience operating it and no experience operating it in the field.  He was trained by his employer and the remainder of his training was self-taught.  He trained one or two people to drive the forklift, but they were also employees at his office.  He still has not designed a forklift or any component part for any piece of handling equipment.  He also has not attended any [American Society of Mechanical Engineers (or "ASME")] meetings or proffered to it alternative designs.  Finally, he does not refer to himself or hold himself out as a biomechanical engineer.

The circuit court also concluded that, as in the *Newell* case, Expert's opinions concerning a defect in the forklift's design were unreliable because his methodology was unsound.  The court explained:

> [H]ere [Expert] has conducted no injury potential testing on his proffered design alternatives.  He cannot point to any door design or

5

bumper he has developed, prototyped, or tested, or any testing to measure the injury potential to stand-up forklift operators in off-dock and tip-over accidents on forklifts equipped with a door or bumper. Like in *Newell*, [Expert] conducted acceleration testing and additionally here he also evaluated egress times from stand-up forklifts, but not on the forklift at issue. No evidence was presented that he performed any tests to see if the alternative designs are both economically feasible and just as safe or safer than the model without the door. With respect to the testing conducted by [Expert], he has not shown the reliability of this testing and how it relates to and supports his proffered designs.

Because Expert had "testified he would not come to trial with an opinion regarding warnings," the circuit court found that he was not competent to offer opinions on that subject either.

Following its ruling excluding Expert's opinions, the circuit court granted Crown's motion for summary judgment the next day. Because it granted summary judgment to Crown on all of Hanshaw's claims, the circuit court did not separately address Crown's motion for summary judgment on Hanshaw's prayer for punitive damages.

Hanshaw appeals.

## Discussion

### I.

In his first two Points Relied On, Hanshaw contends that the circuit court erroneously determined that Expert was unqualified to offer expert opinions concerning the design of Crown's forklift, and that Expert's design defect opinions were unreliable. We agree.

"We review the circuit court's decision to exclude expert testimony for an abuse of discretion." *Campbell v. Union Pac. R.R. Co.*, 616 S.W.3d 451, 474 (Mo. App. W.D. 2020).

6

The admissibility of Expert's testimony is governed by § 490.065.2,[2] which provides in relevant part:

> (1) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) The testimony is based on sufficient facts or data;
>
> (c) The testimony is the product of reliable principles and methods; and
>
> (d) The expert has reliably applied the principles and methods to the facts of the case[.]

The test for admissibility codified in § 490.065.2 can be "boil[ed] . . . down to its essence in a useful three-part test: (1) whether the expert is qualified, (2) whether the testimony is relevant, and (3) whether the testimony is reliable." *State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 319 (Mo. App. E.D. 2018) (citations omitted).

"Section 490.065.2 adopts the Federal Rules of Evidence word-for-word . . . ." *Id.* at 317. This Court has recognized that Federal Rule of Evidence 702, on which § 490.065.2 is patterned, "reflects an attempt to liberalize the rules governing the admission of expert testimony." *Jones v. City of Kansas City*, 569 S.W.3d 42, 56 (Mo. App. W.D. 2019) (cleaned up), overruled on other grounds by *Wilson v. City of Kansas City*, 598 S.W.3d 888, 895-96 (Mo. 2020).

---

[2] Statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated by the 2024 Cumulative Supplement.

Missouri courts have stated that under § 490.065.2, circuit courts must act as "gatekeepers" to prevent irrelevant or unreliable expert testimony from being presented at trial. *See, e.g.*, *Gebhardt v. Am. Honda Motor Co.*, 627 S.W.3d 37, 44 (Mo. App. W.D. 2021) (quoting *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 700 (Mo. App. E.D. 2020)). Our decisions also make clear, however, that a pre-trial motion to exclude expert testimony is no substitute for the trial itself.

> The trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system. In deciding whether to admit an expert's testimony, the circuit court is required to ensure that all of the statutory factors are met; however the court is not required to consider the degree to which they are met. Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

*Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 701-02 (Mo. App. E.D. 2020) (cleaned up).

The Missouri Supreme Court has instructed that, "'[s]o long as the expert is qualified, any weakness in the expert's knowledge is for the jury to consider in determining what weight to give the expert.'" *Linton by Linton v. Carter*, 634 S.W.3d 623, 628 n.5 (Mo. 2021) (quoting *Kivland v. Columbia Orthopaedic Grp., LLP*, 331 S.W.3d 299, 311 (Mo. 2011)); *see also, e.g.*, *Ingham*, 608 S.W.3d at 701; *Crowder v. Ingram Barge Co.*, 681 S.W.3d 641, 646 (Mo. App. E.D. 2023) ("If the expert is sufficiently qualified, . . . the decision to accept his or her analysis of the facts and data is for the jury to decide." (citations omitted)); *Revis v. Bassman*, 604 S.W.3d 644, 655 (Mo. App. E.D. 2020); *State v. Marshall*, 596 S.W.3d 156, 161 (Mo. App. W.D. 2020).

In sum, "[a]s long as an expert's testimony rests upon good grounds, based on what is known, it should be tested by the adversary process with competing expert testimony and cross-examination, rather than excluded by the court at the outset." *Jones*, 569 S.W.3d at 56 (cleaned up).

## II.

We first address whether Expert was "qualified as an expert by knowledge, skill, experience, training, or education" within the meaning of § 490.065.2(1). Because Expert's education, training, and experience abundantly qualify him to testify concerning the design and operation of Crown's forklift, we conclude that the circuit court abused its discretion in finding Expert to be unqualified.

Expert is a registered professional engineer with bachelor's and master's degrees in mechanical engineering. He is board certified in forensic engineering, and is accredited as an accident reconstructionist. Expert has studied the design and safety of stand-up forklifts for more than fifteen years. During that time, he has been a co-author of six peer-reviewed, published articles concerning the design, operation and safety of stand-up forklifts. One paper examined the frequency and severity of various types of accidents involving Crown's stand-up forklifts, based on a review of multiple years' worth of accident reports filed with the federal Occupational Safety and Health Administration (or "OSHA"). Another article which Expert co-authored studied the acceleration and deceleration forces which are generated in operation of stand-up forklifts, which can cause operators to lose their balance, and can cause their limbs to be ejected from the open operator compartment. A third paper studied the relative times it took for operators to exit from stand-up forklifts with and without compartment

9

doors; this article tested the industry's main objection to the installation of doors on stand-up forklifts.

The following passage from Expert's deposition summarizes the testing he has conducted involving stand-up forklifts like the one Hanshaw was operating at the time of his accident:

> I've done performance testing of forklifts, including the lateral and longitudinal acceleration of forklifts as they are in operation and during braking and steering. I've conducted testing of collisions of stand-up rider forklifts and evaluated the horizontal intrusion guarding of those forklifts. I've conducted testing to evaluate the acceleration and speeds during those type of collisions. I've evaluated egress times and egress testing from stand-up rider forklifts utilizing an operator compartment guard.

In addition, Expert testified that, working with a more senior colleague, he had been involved in "between 15 and 30" legal matters involving injuries resulting from the operation of stand-up forklifts. In those cases, as here, Expert and his colleague took the position that "a stand-up rider forklift should be equipped with an operator equipment guard or door."

Expert also has practical experience operating stand-up forklifts. He is licensed to operate a stand-up forklift, and has operated stand-up forklifts manufactured by multiple different companies for between 25 and 50 hours. Expert has also been certified to train others to operate stand-up forklifts, has trained two other individuals, and has compiled training materials for purposes of teaching others how to operate such equipment.

Federal courts have permitted experts with similar, or lesser, qualifications to offer precisely the same design defect opinions as Expert. In *Anderson v. Raymond Corp.*, 61 F.4th 505 (7th Cir. 2023), the United States Court of Appeals

for the Seventh Circuit recently reversed a district court's exclusion of an expert who offered an opinion identical to Expert's: that a stand-up forklift was defective because of its failure to fully enclose the operator compartment with a rear door. In finding the expert to be qualified, *Anderson* noted his graduate education in mechanical engineering, the expert's possession of "a license to operate a stand-up forklift like that at issue here," and the fact that the expert had "spent most of his professional career" as a forensic engineer, "investigating machine accidents and performing accident reconstructions." *Id.* at 509. Unlike Expert, the expert in *Anderson* had "limited experience with forklifts." *Id.* The Court held this was irrelevant: "An expert's specialization or lack thereof typically goes to the weight to be placed on [his] opinion, not its admissibility. Ordinarily, courts impose no requirement that an expert be a specialist in a given field." *Id.* (cleaned up).[3] Expert was substantially more qualified than the expert at issue in *Anderson*.

The circuit court found that Expert was not qualified for the following reasons:

---

[3]    Other federal cases reach the same result as *Anderson*. *See*, *e.g.*, *Jones v. Raymond Corp.*, 2023 WL 309055, at *4 (N.D. Miss. Jan. 18, 2023) (finding same expert at issue in *Anderson* to be qualified to offer similar opinions; noting that, "although [expert] may not have specifically specialized in stand-up lift trucks, he has experience in engineering design, product design, accident investigation, and accident reconstruction."); *McHale v. Crown Equip. Corp.*, 2021 WL 289346, at *2-*5 (M.D. Fla. Jan. 28, 2021) (same); *Hernandez v. Crown Equip. Corp.*, 92 F. Supp.3d 1325, 1345 (M.D. Ga. 2015) (expert qualified where he possessed bachelor's and master's degrees in mechanical engineering, and "has conducted over two hundred investigations dealing with injuries to drivers of stand-up forklifts, and has reviewed thousands of accident reports from various forklift manufacturers, OSHA, and state agencies. His analysis and research in the area of forklift accidents were the subject of a peer-reviewed paper he presented to the American Society of Mechanical Engineers ('ASME') in 2011.").

Since the *Newell* case, [Expert] obtained a license to operate a forklift, but still does not have extensive experience operating it and no experience operating it in the field. He was trained by his employer and the remainder of his training was self-taught. He trained one or two people to drive the forklift, but they were also employees at his office. He still has not designed a forklift or any component part for any piece of handling equipment. He also has not attended any ASME meetings or proffered to it alternative designs. Finally, he does not refer to himself or hold himself out as a biomechanical engineer.

Given Expert's extensive education, training, and experience, the circuit court's quibbles cannot justify the wholesale exclusion of Expert's testimony at trial. As explained above, "'[i]n deciding whether to admit an expert's testimony, the circuit court is required to ensure that all of the statutory factors are met; however the court is not required to consider the *degree* to which they are met.'" *Ingham*, 608 S.W.3d at 702 (emphasis added; quoting *Kivland*, 331 S.W.3d at 311). While Expert may not have *designed* a forklift or forklift component, he is plainly highly knowledgeable concerning the safety issues surrounding the design and operation of stand-up forklifts. It may be that a mechanical engineer who had actually *designed* the operator compartment of a side-stance, stand-up forklift would be <u>more</u> qualified than Expert to testify to the relative merits of that design. But whether a *more qualified* expert may exist is not the question.

The same could be said of the circuit court's criticism that Expert "does not have extensive experience operating [a stand-up forklift] and no experience operating it in the field." While others may have more than the 25-50 hours of operating experience which Expert possesses, and may have actually worked as forklift operators in a warehouse, § 491.065.2 does not require that Expert be the *most qualified* possible expert witness. The fact that he has been certified to

operate a stand-up forklift, and to train others to do so, plainly constitutes a relevant qualification, even if additional qualifications may exist.

Although the circuit court found Expert to be unqualified because he "has not attended any ASME meetings," three of Expert's most salient articles concerning the design and safety of stand-up forklifts – and of *Crown's* forklifts in particular – were published by ASME: the articles analyzing Crown's accident data; measuring egress times from the forklift's operator compartment with and without a rear door; and measuring the acceleration forces generated by stand-up forklifts during deceleration and turning maneuvers. The fact that Expert may not have *physically attended* ASME meetings, and presented his papers there, is not disqualifying.

Finally, the circuit court's statement that Expert "does not refer to himself or hold himself out as a biomechanical engineer" ignores the fact that, in his deposition and in an affidavit submitted to the court, Expert explained that he has "education and experience in the field of biomechanics," and that he has previously "qualified and testified regarding occupant kinematics, forces and motion of vehicle occupants, during car crashes."

The circuit court applied an unrealistic and overly demanding standard in assessing Expert's qualifications. As Hanshaw's opening Brief cogently observes,

> the trial court wanted someone that: (1) worked in a warehouse operating a forklift; (2) also worked for a company, presumably as a mechanical engineer, designing forklifts; (3) attended ASME meetings or sent alternative design suggestions to ASME; and (4) was also a biomechanical engineer.

The circuit court insisted on an unreasonable combination of experiences in order for Expert to be considered "qualified" within the meaning of

13

§ 490.065.2(1). It was not necessary for Expert to be the proverbial "unicorn" for Hanshaw to be entitled to present his opinions to the jury at trial. The circuit court abused its discretion in excluding Expert's opinions based on its conclusion that he was unqualified to offer them.

## III.

The circuit court also abused its discretion in concluding that Expert's design defect opinions were not reliable.

## A.

When reviewing Expert's design-defect opinions, it is important to bear in mind that, under Kansas law, Hanshaw does not have the burden to establish a safer alternative design for Crown's forklift. The Kansas Supreme Court has explicitly rejected the definition of a design defect found in the Restatement (Third) of Torts: Products Liability. The Restatement provides that "a product is defective in design where 'the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design . . ., and the omission of the alternative design renders the product not reasonably safe.'" *Delaney v. Deere & Co.*, 999 P.2d 930, 944 (Kan. 2000) (quoting Restatement (Third) of Torts: Products Liability § 2(b)). In rejecting the requirement that the plaintiff prove the greater safety of an alternative product design, the Kansas Supreme Court explained:

> Kansas law has been clear in allowing evidence of the feasibility of an alternative design in the trial of a design defect. However, Kansas has consistently held that evidence of a reasonable alternative design may but is not required to be introduced in a design defect action. Kansas has not used the concept of reasonable alternative design to become the standard by which the questioned product is measured.

14

. . . .

> The Third Restatement's requirement that a plaintiff produce a reasonable alternative design has been harshly criticized.  [One commentator] states that the reasonable alternative design requirement is not supported by public policy or economic analysis because the cost of processing a case will make it economically impossible to produce a reasonable alternative design in a small products liability case.  Further, contrary to the view of the authors of the Third Restatement that the majority of states require a reasonable alternative design to establish a design defect, research . . . indicates that very few states in fact have this requirement.  . . .  It is clear in Kansas that evidence of a reasonable alternative design may be presented but is not required.  We adhere to this principle and believe that it represents the majority rule in this country.

*Id.* at 945-46 (citations omitted); *see also Moore v. Ford Motor Co.*, 332 S.W.3d 749, 759–60 (Mo. 2011) ("Missouri does not require a plaintiff to create an alternative design to prove a design defect claim; it is enough that plaintiff show that the design used was defective and unreasonably dangerous." (citation omitted)).

Thus, in evaluating the reliability of Expert's opinions, we must be mindful that Hanshaw's burden was only to prove that Crown's forklift was unreasonably dangerous – *not* that a specific alternative design would have made it safer.

We first address the circuit court's exclusion of Expert's opinion that Crown's forklift was defectively designed because of the lack of a door.  Contrary to the circuit court, we conclude that Expert had a substantial, reliable basis to offer this defective design opinion.

The primary basis on which the circuit court found Expert's opinions to be unreliable was that "[h]e cannot point to any door design or bumper he has developed, prototyped, or tested, or any testing to measure the injury potential to

15

stand-up forklift operators in off-dock and tip-over accidents on forklifts equipped with a door or bumper." This statement misapplies the law, and fundamentally misstates the record.

The stringent testing standard the circuit court applied to Expert's design defect opinions is legally unfounded. In the circuit court and again on appeal, Crown criticizes Expert for not having conducted "injury potential testing" of his alternative designs using anthropomorphic dummies. The circuit court adopted that criticism, and added that Expert "cannot point to any door design or bumper he has developed, prototyped, or tested." However, Expert was not required to actually design, patent, prototype, and test an alternative design for Crown's forklift in order to be able to testify that the existing design is unreasonably dangerous. Nor was he required to determine the economic feasibility of an alternative design. As the Kansas Supreme Court explained in *Delaney*, if this level of analysis were required, "the cost of processing a case will make it economically impossible to produce a reasonable alternative design in a small products liability case." 999 P.2d at 946.

Caselaw holds that building and testing an alternative design may be unnecessary where the alternative design is available in the marketplace. In this case, Hanshaw emphasized to the circuit court that Crown itself provided doors on the operator compartments of the forklifts it sold to Ford Motor Company until 2008, and offered doors as optional equipment to other customers until 2010. Similar doors are offered by other manufacturers. The deployment of rear doors on commercially available stand-up forklifts reduces, if not eliminates, the need for Expert to have himself tested the feasibility and safety consequences of

installing a door.  *See Anderson v. Raymond Corp.*, 61 F.4th 505, 510 (7th Cir. 2023) ("Raymond's customers who have elected to fit their forklifts with Raymond's optional door have been testing [plaintiff's expert's] alternative for him.  Raymond can critique the use of those customers as comparators, but such arguments go to the weight, not the admissibility, of [expert's] testimony."); *Jones v. Raymond Corp.*, 2023 WL 309055, at *7 (N.D. Miss. Jan. 18, 2023) ("'where the proposed alternative design has been produced and put to practical use in the industry, the expert does not need to personally test it to satisfy *Daubert*'" (citation omitted)); *McHale v. Crown Eqpmt. Corp.*, 2021 WL 289346, at *3 (M.D. Fla. Jan. 28, 2021) (permitting expert to testify to the defective design of Crown's RC5500 forklift due to its lack of a rear door and alternative braking system, based in part on the fact that "forklifts with rear doors and with [expert's] proposed brake system have been produced and put to practical use in the industry"); *Gott v. Raymond Corp.*, 2008 WL 11452486, at *6 (N.D. W.Va. Dec. 19, 2008) (permitting expert to testify to defective design of stand-up forklift without a rear door, despite expert's failure to design or test an alternative design; noting that, "in an apparent recognition of the fact that their stand-up lift trucks can be hazardous without doors in certain situations, The Raymond Corporation has produced spring loaded doors for their forklifts").

In any event, while Expert may not have conducted the level of prototype design and testing necessary to bring a new product to market, he <u>has</u> conducted research and testing which supports the opinion that his proposed design is safer than Crown's open-compartment design.  As Crown explains in its Brief, the

industry's resistance to the installation of doors on stand-up forklifts has been primarily based on the following reasoning:

> (1) Operators of stand-up rider forklifts have the best chance to avoid serious injury in tipover and off-the-dock accidents by exiting the machine; and (2) a door would hinder that maneuver.

Expert's research has tested, and evaluated, the reasoning underlying the industry's resistance to operator-compartment doors. His research also illuminates whether the installation of doors would have net positive, or negative, effects on operator safety. Expert has done this in three ways.

1.      Expert testified in his deposition that he conducted testing of the egress times from a Crown RC3000 forklift, the predecessor to the RC5500 forklift which Hanshaw was operating. Crown's corporate representative testified that the operator compartment of the RC3000 is configured similarly to an RC5500. (Given that its operator compartment is similarly configured, the circuit court's complaint that Expert had not conducted egress-time testing "on the forklift at issue" misses the mark.) Expert testified that he and his co-authors tested egress times when the forklift was equipped with no door, with a spring-loaded door, and with a "latched" door (with a crash-bar) which Expert had designed and installed. The results of Expert's analysis were peer-reviewed, and published in the ASME's proceedings.[4]

---

[4]      Because of the confidentiality rules imposed by § 509.520.1(5), RSMo, we do not provide complete citations to any of the articles of which Expert was a co-author. *See* footnote 1, above.

The circuit court was provided with full citations to each of Expert's published articles concerning the safety and performance of stand-up forklifts. In the circuit court and on appeal, the parties have discussed the contents of those articles, and have debated whether Expert's articles provide support for the opinions he offers in this case. Nevertheless, the articles themselves were not filed with the circuit court, and have not been made part of the record on appeal. We do not decide whether, in these

Crown acknowledges that Expert's egress-time article "mentioned the alternative designs he proposes in this case." Nevertheless, it dismisses that article by contending that

> [t]he sole purpose of that article was to test the egress times for operators exiting stand-up forklifts with a door, not to study the safety aspects of his proposed designs and the serious risks presented with adding an operator compartment barrier/door in collision, tipover, or off-the-dock accidents.

Crown's assertion that Expert's egress-time article did not "study the safety aspects of [Expert's] proposed designs" is simply a *non sequitur*. Crown's own Brief asserts that the primary safety concern with the installation of doors on stand-up forklifts is that "a door would hinder th[e] maneuver" of an operator exiting the vehicle in a tip-over or off-the-dock accident. *See Anderson*, 61 F.4th at 510 (noting that "the need for a quick escape in [stability accidents] was [another manufacturer's] justification for not fitting a door as standard"). Expert's egress-time study tests the accuracy of this very claim. It is inaccurate for the circuit court, and for Crown, to claim that Expert has failed to test the safety implications of door installation. *See Hernandez v. Crown Equip. Corp.*, 92 F. Supp.3d 1325, 1346 (M.D. Ga. 2015) (permitting another expert to testify to the results of an egress-time study similar to that conducted by Expert, even though expert's study was performed on a forklift designed by a different manufacturer).

---

circumstances, it is appropriate for the Court to refer to the content of the articles themselves. Instead, we have relied only on the description of Expert's published articles contained in his deposition testimony and supplemental affidavit, both of which were filed with the circuit court in connection with Crown's exclusion motion. As in all litigation, parties should be mindful to include in the record, both in the circuit court and on appeal, all materials necessary to the disposition of contested issues.

2.      Besides conducting an experiment which challenged the belief that doors would "hinder th[e] maneuver" of exiting the operator compartment in a tip-over or off-the-dock accident, Expert also conducted a detailed review of years' worth of Crown's own accident reports.  Based on that review, Expert concluded that – for stand-up forklifts – collision accidents like the one Hanshaw experienced are a far more serious concern than "stability" accidents like tip-overs or off-the-dock accidents.

Expert conducted his most detailed review of Crown's stand-up forklift accident data in 2008, but updated it thereafter.  Post-2008, Expert's analysis "focused on the OSHA fatal accident and injuries databases and an analysis of that information that's publicly available."  Based on his review of the accident data, Expert concluded that tip-over accidents "are not very severe accidents in terms of the acceleration and the forces applied to the operator"; he also testified that "it's unlikely that you're going to sustain fatal injuries" in such an accident. Expert concluded that "collisions are much more deadly, much more serious for the operators of stand-up forklifts than sit-down forklifts."  Expert's review indicated that 76% of lower limb injuries are caused by the operator's leg inadvertently exiting the operator compartment.  Expert specifically disagreed with OSHA's conclusion that tip-over accidents presented the greatest risk of serious injury during operation of *stand-up* forklifts.  He noted that OSHA had "lump[ed] . . . stand-up forklifts and sit-down forklifts all into the same category"; for that reason, "OSHA's characterization of the data I think is misleading and unhelpful."  *See Hernandez*, 92 F. Supp.3d at 1346 (permitting expert to offer design defect opinions similar to Expert's, based in part on the expert's review of

20

Crown accident reports, and his conclusion that lower-limb crush injuries represented "'a very large number of serious, disabling injuries'").

3.      Besides leading him to conclude that collision accidents are a more serious risk than stability accidents, Expert's comprehensive review of Crown's accident reports also revealed that exiting the operator compartment of a stand-up forklift is <u>not</u> the safest course in an off-the-dock accident.  Instead, Expert concluded that the primary risk to operators in "off-the-dock" accidents is the danger of being crushed by the falling forklift *if the operator ejects*.  During his deposition, Expert testified as follows:

> Q.  And do off-the-dock accidents present life-threatening injury potential to an operator?

> A.  I think that they do.  I don't think that they necessarily come from the potential for head injury or spinal injury, again, as the VRC/SEA-type testing would suggest, I think that they present life-threatening injuries from the potential of being crushed by the forklift.

> Q.  And, in fact, from your review of accident reports, operators have been killed in off-the-dock accidents; correct?

> A.  Yes.  Again, primarily as a result of being crushed by the forklift, not as a result of sustaining head impact injuries or spinal injuries from falling on the ground.

Because of the risks of being crushed if the operator ejects in an off-the-dock accident, Expert testified that he would not recommend that operators eject in all cases, and that operators are effectively in a "no-win situation" when stand-up forklifts are used near loading docks; "[i]t's a dangerous situation to go off-the-dock in a stand-up forklift regardless of whether you jump or stay or are ejected." Expert's conclusion that an operator would be safer remaining in the forklift in a stability accident, based on his analysis of Crown's accident data, is reliable, and

21

"will assist the jury, since Crown contends that the addition of a door on the RC5500 would impede an operator's egress from the operator compartment during a tip-over or off-the-dock incident." *McHale*, 2021 WL 289346, at *4.

\* \* \* \* \*

The criticism that Expert has not tested the safety of an alternative forklift design incorporating compartment doors, or performed "injury potential" testing, suggests that Expert failed to evaluate the risk to operators from tip-over and off-the-dock accidents, as compared to the risk of lower-limb injuries in collisions. But Expert *did* analyze comparative egress times with and without doors, *and* he performed a detailed analysis of accident reports involving stand-up forklifts (which indicated that collision accidents present the far greater risk, and that ejecting from a falling stand-up forklift presents its own risks). Given the testing and research Expert *has* conducted, his failure to conduct "injury potential" testing using anthropomorphic dummies is not disqualifying. Expert's research supports his conclusions that doors will not materially hinder operators from exiting a forklift in an emergency; that exiting the forklift may not be the safest course of action in a stability accident in any event; and that guarding against collisions is a more important means of reducing fatal and serious-injury accidents than taking precautions against stability accidents.

In its briefing, Crown emphasizes that equipping stand-up forklifts with doors would be inconsistent with ASME/ANSI standards, and with OSHA regulations. Crown does not argue, however, that those standards or regulations *prohibit* the installation of doors. Expert's disagreement with standard-setting organizations or government regulators is not disqualifying. *See Anderson*, 61

F.4th at 511 ("While ANSI may suggest a preference for open operating compartments, we are aware of no case stating that an expert who disagrees with ANSI's suggestion is categorically barred from testifying. Just the opposite: ANSI's recommendation, standing alone, is not a dispositive consideration." (cleaned up)). Moreover, at oral argument Crown's counsel acknowledged that the standards and regulations permit the installation of doors at least in certain circumstances. We note once again that Crown actually *produced* stand-up forklifts with latching doors for Ford Motor Company until 2008, and only discontinued the installation of doors on its stand-up forklifts in 2010.

The fact that Expert's opinions may disagree with recommendations made by regulators and safety organizations will plainly provide a substantial basis for Crown to challenge the credibility of his opinions; the inquiry under § 490.065.2 is not intended to decide the *persuasiveness* of an expert's opinions, however. The fact that Expert's opinions may be contrary to the views of government regulators and engineering organizations is an issue for a jury to weigh – it is <u>not</u> a basis to exclude Expert's opinions entirely.

For the foregoing reasons, we find that the circuit court abused its discretion in excluding Expert's design defect opinions based on its conclusion that those opinions were unreliable.

**B.**

The dissenting opinions do not attempt to defend the circuit court's conclusion that Expert was unqualified. They argue, however, that the circuit court acted within its discretion in finding that Expert's opinions were not reliable.

The dissenting opinions' primary contention is that Hanshaw relied on an outdated version of § 490.065 in opposing Crown's motion to exclude Expert's testimony. The dissents claim that due to his reliance on old law, Hanshaw mistakenly argued that Expert's opinions were admissible based solely on his general qualifications, and made no effort to show that Expert's opinions were based on the reliable application of reliable principles and methods.

The dissents' characterizations of Hanshaw's circuit-court briefing are incomplete. Admittedly, Hanshaw's response to Crown's exclusion motion mistakenly included a block quotation of §§ 490.065.1 to .4, RSMo 2016 – a statute which was substantially amended by the General Assembly in 2017. Despite this erroneous quotation, however, Hanshaw's response to the motion to exclude cited *State ex rel. Gardner v. Wright*, 562 S.W.3d 311, 317 (Mo. App. E.D. 2018), which interprets and applies the *current* version of § 490.065.2. Hanshaw cited *Wright* for its recognition that the post-2017 version of § 490.065.2 "is identical to Federal Rules of Evidence 702-705." Hanshaw also quoted the three-part test *Wright* used to summarize the requirements of the current statute: "(1) whether the expert is qualified, (2) whether the testimony is relevant, and (3) *whether the testimony is reliable*." 562 S.W.3d at 319 (emphasis added).

Contrary to the dissents' claims, Hanshaw did not limit his arguments to Expert's general qualifications. After arguing that Expert was sufficiently qualified to offer expert opinions concerning the design of Crown's forklift, the next heading in Hanshaw's response explicitly argued that Expert's "opinions on stand-up forklift designs are reliable." Hanshaw began his reliability argument by quoting *Wright*'s paraphrase of the requirements of §§ 490.065.2(2)(1)(b)

through (d): he argued that "[t]estimony is reliable if it is 'based on sufficient facts or data, reliable principles and methods and reliable application thereof.'" (Quoting *Wright*, 562 S.W.3d at 319). It is simply inaccurate for our dissenting colleagues to claim that "[n]owhere in his Response does Hanshaw assert that [Expert]'s opinions satisfy the reliability requirements of section 490.065.2(1)(a)-(d); these requirements are not even identified." (Emphasis omitted.)

The dissents also contend that Hanshaw's opposition to the motion to exclude failed to explain how Expert's prior research work, or his investigations in this case, support his opinions. On the contrary, the manner in which Expert came to his opinions concerning the design of Crown's forklift was not a mystery to the circuit court. In § III.A, above, we have described and quoted excerpts from Expert's deposition and affidavit, which explain how his prior studies supported his design-defect opinions. Hanshaw provided all of those materials to the circuit court in opposing Crown's exclusion motion. In addition, Hanshaw's suggestions in opposition explained the work Expert had done to formulate his opinions in detail, with appropriate record citations:

> For this case, [Expert] has conducted or reviewed . . . Performance testing of forklifts, including the lateral and longitudinal acceleration of forklifts in operation during backing and steering. Further, [Expert] has conducted or reviewed Testing to evaluate the acceleration and speeds during forklift collision. [Expert] has conducted or reviewed testing for Evaluation of egress times from stand-up forklifts. [Expert] has analyzed speeds and accelerations of an RC-5500, the model of lift that is the subject of the pending matter. [Expert] has compared that data to accelerations and speeds from data obtained from Crown and from inspecting the subject lift. [Expert] compared all such data to the video of the actual incident involving Mr. Hanshaw.

25

[Expert] has inspected the facility at the location of the incident; inspected the subject forklift; reviewed all depositions, including the depositions of Crown employees, representatives, and expert witnesses; reviewed 135 photographs of the site and of the subject forklift; created a 3D model of the site of the incident; created a 3D model of the subject forklift; created speed analysis of the forklift during the actual event relying on video footage of the collision; and performed safety engineering analysis of the Crown forklifts relying on design engineering principles assessing the foreseeable failure and effects modes. [Expert] has analyzed Crown accident data reported by Crown and used this information in developing his opinions. [Expert] has partially based his opinions on in this case, the data obtained through OSHA of fatal accidents and injuries attributed to operation of forklifts, which note that seventy-six percent of all lower limb injuries of operators of stand-up forklifts are attributable to the operator's lower limb being inadvertently outside the operator's compartment.

Moreover, Hanshaw's response to the motion to exclude explained that Expert's opinion that "a latching door on the subject forklift would improve its overall safety . . . was derived after obtaining a Crown RC3000 forklift and modifying it to include a door." This statement was supported with specific citations to the portions of Expert's deposition in which he described the egress-time testing he had conducted to assess the forklift industry's claim that a rear compartment door would hinder operator exit in the event of a stability accident. (To be clear, Hanshaw's response to the motion to exclude cited to specific numbered paragraphs from his Additional Statement of Uncontroverted Material Facts in Opposition to Summary Judgment, which was filed simultaneously; Hanshaw's statements of uncontroverted fact *in turn* cited to specific passages of Expert's deposition by page and line number. While the deposition references were not *literally* contained in Hanshaw's response to the motion to exclude, the effect is the same.)

26

The dissenting judges also contend that Expert's design-defect opinions suffer from the same "analytical gap" which we found disqualifying in *Gebhardt v. American Honda Motor Co.*, 627 S.W.3d 37 (Mo. App. W.D. 2021). *Gebhardt* is plainly distinguishable, however. In *Gebhardt*, an expert opined that an all-terrain vehicle (or "ATV") suffered from a design defect, based in part on a manufacturer's recall. The recall addressed the risk that, *over time*, water could infiltrate a throttle mechanism, causing the ATV "to *fail to return to idle*" if the water *froze*. 627 S.W.3d at 45 (emphasis added). In the *Gebhardt* case, the expert claimed that the plaintiff's ATV experienced *sudden acceleration* due to the *immediate* effect of *liquid water* on the throttle mechanism. *Id.* Thus, the expert in *Gebhardt* relied on the manufacturer's recall to support his opinion, even though the manufacturer's recall involved a different failure mode, occurring over a different time span, producing a different outcome.

In addition, in *Gebhardt* the expert's opinion was based on his assumption that water had splashed up into an area near the ATV's throttle mechanism, and then further assumed that this water came into contact with the throttle mechanism itself – with no *evidence* that such water infiltration had actually occurred. *Id.* at 45-46.

Unlike in *Gebhardt*, in this case Expert did not speculate as to the circumstances of Hanshaw's injury, or as to the features of Crown's forklift which caused that injury. Expert conducted a detailed accident reconstruction based on an inspection of the site where the accident occurred and of the forklift Hanshaw was operating; review of video footage of the collision; and review of the depositions of Crown employees and experts. Expert constructed a three-

dimensional model of the accident site and the forklift, and calculated the speed, and the rates of acceleration and deceleration, of the forklift immediately prior to the accident.  Based on this analysis, Expert concluded that Hanshaw had not attempted to jump from the truck, and had not stuck out his foot to try to "fend off" the pole he was approaching.  Instead, Expert concluded that "[i]t's the deceleration and the lateral acceleration of the forklift at the same time" that caused Hanshaw to lose his balance, and caused his foot to come out of the operator compartment – a mechanism of injury which Expert contends would have been defeated by the addition of a compartment door.

As Judge Thomson asserts, it may be "a contested factual issue" whether Hanshaw's injury occurred in this manner, and whether a compartment door would have prevented that injury; but those contested factual issues are for a fact-finder to decide, not for the court to decide on a motion to exclude expert testimony (or on a motion for summary judgment).  As this Court has emphasized, the circuit court's role in addressing a motion to exclude expert testimony is not to judge the *persuasiveness* of the expert's opinions, or "to serve as a replacement for the adversary system." *Ingham v. Johnson & Johnson*, 608 S.W.3d 663, 701 (Mo. App. E.D. 2020).  Instead, "'[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.'" *Id.* at 702 (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 596 (1993)).  For present purposes, it suffices to note that there is no "analytical gap" in Expert's opinions between the claimed defect in the forklift's design and the injury Hanshaw suffered.

**IV.**

In his briefing, Hanshaw also argues that Expert was competent to opine that the use of *bumpers* on Crown's forklift presented a safer design alternative. During his deposition, however, Expert testified that "I don't know that I have an opinion in that area," when he was asked whether bumpers should be added to Crown's forklift instead of a door. He also testified that he was "not sure" whether or not a bumper would have prevented Hanshaw's injuries. Expert also did not identify any prior research or testing he had conducted concerning the safety effects of adding bumpers to a stand-up forklift like the Crown RC5500. Given Expert's testimony, and his lack of experience with forklift bumpers, the circuit court acted well within its discretion in excluding Expert's opinion that the Crown forklift was defective for lack of a rear bumper.

Hanshaw's discovery responses suggested that Expert might also provide opinions concerning the necessity and adequacy of *warnings* on Crown's forklift. During his deposition, however, Expert testified that he was <u>not</u> opining that the forklift was defective due to the lack of adequate warnings, and Hanshaw does not challenge the exclusion of any warnings-related opinions on appeal. We therefore have no basis upon which to question the circuit court's conclusion that Expert was not entitled to give warnings-related opinions.

Finally, we note that Expert testified in his deposition that he believed Crown's stand-up forklifts were not appropriate for use in warehouse settings with loading docks like the one where Hanshaw was working, and that Crown should offer its customers other forms of material handling equipment as an alternative. Hanshaw does not seek to defend the admissibility of that opinion on appeal, and we consider the point abandoned.

## V.

In his final Point, Hanshaw contends that the circuit court erroneously granted summary judgment on his prayer for punitive damages. The circuit court's exclusion order and judgment reflect, however, that the court did not address Crown's alternative motion for partial summary judgment on punitive damages. Moreover, Hanshaw argued in the circuit court <u>both</u> that the summary-judgment evidence justified the submission of punitive damages, <u>and</u> that a ruling on this issue was premature pending further factual development. In these circumstances, we decline to address this issue, which the circuit court never reached.

### Conclusion

Hanshaw presented an expert witness who had substantial experience studying and testing the performance and safety of stand-up forklifts. The opinion expressed by Hanshaw's expert – that Crown's forklift was unreasonably dangerous based on its lack of a rear door – was supported by his prior research work, and by his in-depth investigation of the circumstances surrounding Hanshaw's accident. Assessment of the credibility and probative value of that opinion was an issue for a jury to decide at trial – not a question for the circuit court to decide in pre-trial motions practice. The circuit court abused its discretion in concluding that Hanshaw's expert was unqualified, and that his design defect opinion concerning the lack of a door was unreliable. The circuit court's order excluding Hanshaw's expert from testifying, and its grant of summary judgment to Crown based on the exclusion order, are reversed. The

case is remanded to the circuit court for further proceedings consistent with this opinion.

_____
Alok Ahuja, Judge

Chief Judge Gabbert, and Judges Hardwick, Pfeiffer, Mitchell, Martin, Witt, Ardini, and Sutton concur.

Judges Chapman and Thomson dissent in separate opinions.



# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

CHRISTOPHER HANSHAW, )
)
Appellant, )
)
v. ) WD86389
)
CROWN EQUIPMENT CORP., ET AL, ) Filed: April 1, 2025
)
Respondent. )

## DISSENTING OPINION

I respectfully dissent with that portion of the majority opinion which determines the trial court abused its discretion in finding that Hanshaw failed to address the reliability requirements for expert testimony set forth recently by our legislature.[1] I write to detail my concern that Hanshaw's expert has not addressed the required reliability standards set forth by our legislature in section 490.065.2(1)(a)-(d), and therefore the trial court did not abuse its discretion in

---

[1] I agree with the majority opinion in determining that "the circuit court acted well within its discretion in excluding [Proposed] Expert's opinion that the Crown forklift was defective for lack of a rear bumper." (Majority p. 24). I also agree that the majority opinion's determination that there is "no basis upon which to question the circuit court's conclusion that [Proposed] Expert was not entitled to give warnings-related opinions." (Majority p. 24).

excluding the testimony of B.R. (Hanshaw's proposed expert), and its resulting summary judgment. This is rendered poignant here, because in his briefing to the trial court and the exhibits thereto Hanshaw clearly sets forth and addresses the *former* statutory requirements regarding expert testimony, and ignores the additional requirements of the current statute. Make no mistake, Hanshaw's use of the former statute is not, in and of itself, the reason I dissent. Rather, his use and application of it explains why his argument to the trial court did not satisfy current section 490.065.2(1)(a)-(d). It simply hamstrung his argument to the trial court, and necessarily renders his argument to this court futile. Our legislature made changes to the statute in 2017, and I do not believe the clear language of those changes suggest any abuse of discretion by the trial court here.

To determine whether this trial court abused its discretion, we must look to what was presented to the trial court to make the ruling in question. Here, instead of doing so, the majority opinion must manufacture the argument Hanshaw could have made had he addressed the proper statute at the trial court level, yet in doing so the majority still does not follow the requirements of section 490.065.2(1)(b)-(d) articulated by our legislature. While the majority opinion says the trial court quibbles with what Hanshaw presented in making its ruling, it is the majority opinion which cherry picks from the trial court's findings to find error, yet fails to look at the clear and correct analysis made by the trial court as to reliability of B.R., an analysis which follows this court's recent case on point and the current version of section 490.065.2. This, in the wake of Hanshaw's

2

complete failure to enunciate and address current 490.065.2 at the trial court level makes the proper outcome clear. Here, where B.R.'s proposed expert testimony must satisfy the twin prongs of being qualified and reliable, there is no question the trial court did not abuse its discretion in finding B.R.'s testimony failed to do so with respect to the reliability prong.[2] And, because Hanshaw was required to satisfy both prongs, there can be no question the trial court did not abuse its discretion in excluding the testimony of B.R.

## I. The Applicable Statutory Standard

Section 490.065 governs the admission of expert testimony in Missouri courts. The Missouri legislature amended Section 490.065 in 2017 to apply a more stringent standard to parties desiring to present expert testimony in certain actions, such as the tort action here. A comparison of section 490.065 before and after its revisions in 2017 is critical, as Hanshaw's Response to the motion to exclude relied upon the *wrong version* of the statute, and thereby failed to address today's statutory requirements when arguing before the trial court.

---

[2] The majority has dedicated section III.B. of its opinion to address our dissents. From the outset, it seeks to discount that we do not address the trial court's conclusion that B.R. is not qualified. But because B.R. must be both qualified *and* his opinions reliable pursuant to section 490.065.2(1)(a)-(d), we need not address both prongs. The majority is well aware that appellate courts must affirm the circuit court's judgment if it is correct on *any* ground supported by the record. *See Curtis v. Mo. Democratic Party*, 548 S.W.3d 909, 918 (Mo. banc 2018). In light of this well-established principle, for the majority to assert that the "dissenting opinions do not even attempt to defend the circuit court's conclusion that [B.R.] was unqualified" is, at best, irrelevant, when it is clear we need not address the prongs of both qualification and reliability in order to affirm the trial court's judgment.

3

As relevant to this case, *current* section 490.065.2(1), applicable to tort actions such as the one at hand, provides:

(1)    A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise *if*:

(a)    The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b)    The testimony is based on sufficient facts or data;

(c)    The testimony is the product of reliable principles and methods; *and*

(d)    The expert has reliably applied the principles and methods to the facts of the case[.]

(emphases added). The plain language of this standard makes clear that a witness who is qualified as an expert may provide opinion testimony and other testimony *only if* four additional requirements which measure reliability are also met. In other words, being qualified alone is not enough; rather, the proponent of a proffered expert must also make a sufficient showing regarding this reliability prong. *See* section 490.065.2(1)(a)-(d).

The current and applicable version of Section 490.065.2 differs significantly from the prior version.[3] Prior to August 28, 1017, section 490.065 stated:

1.    In any civil action, if scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge,

---

[3] The current section 490.065.1 is nearly identical to *former* section 490.065. However, current section 490.065.1 is only applicable to actions brought under certain chapters of the Revised Statutes of Missouri, none of which are applicable in this tort action. In this case, we agree with the majority that current section 490.065.2 is the applicable subsection.

4

skill, experience, training, or education may testify thereto in the form of an opinion or otherwise.

2.      Testimony by such an expert witness in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact.

3.      The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable.

4.      If a reasonable foundation is laid, an expert may testify in terms of opinion or inference and give the reasons therefor without the use of hypothetical questions, unless the court believes the use of a hypothetical question will make the expert's opinion more understandable or of greater assistance to the jury due to the particular facts of the case.

In other words, prior to 2017, an expert was permitted to testify in Missouri if they were *qualified* as an expert (former section 490.065.1) and the opinion was based on facts found reasonably reliable (former section 490.065.3).  Pursuant to the current version, the legislature has required that an expert is permitted to testify only if they are *both qualified and* meet four additional, specific statutory requirements regarding the *reliability* of their opinions. *See* Section 490.065.2(1)(a)-(d).

## II.     Hanshaw Did Not Address, or Even Reference, the Specific Reliability Requirements of Section 490.065.2(1)(b)-(d).

In order to determine whether a trial court has abused its discretion, we must be mindful of the argument presented to the trial court for its consideration.  Here, in his reply to Crown's motion to exclude B.R., Hanshaw did not even reference to section 490.065.2(1)(b), (c), or (d), the reliability

5

requirements of the statute. This fact, the majority opinion cannot escape. Hanshaw did not demonstrate *what* facts or data B.R. considered in forming its opinions as required in Section 490.065.2(1)(b), *how* B.R.'s opinions were the product of reliable principles and methods as required in Section 490.065.2(1)(c), or *how* B.R.'s *reliably* applied the principles and methods he used to the facts of the case as required by Section 490.065.2(1)(d). Accordingly, it is curious how the trial court could have abused its discretion in finding Hanshaw failed in his obligation to prove the reliability of his purported expert.

First, it is notable that the majority opinion is largely silent or makes assumptions as to what B.R. specifically relied upon, and which is included in the record, *in this case*. The majority opinion does not discuss how what B.R. relied upon *in this case* informed the opinions he ultimately expressed. Instead, the majority opinion spends most of its time discussing B.R.'s generalized research, which is comprised of publications not included in the record before this Court or the trial court. According to the majority opinion, B.R.'s general research, although outside of the record, "supports his conclusions that doors will not materially hinder operators from exiting a forklift in an emergency; that exiting the forklift may not be the safest course of action in a stability accident in any event; and that guarding against collisions is a more important means of reducing fatal and serious-injury accidents than taking precautions against stability accidents." (Majority, pp. 22-23).

6

The most obvious error with the majority opinion's reliance on B.R.'s

research, which is not materially part of the record, is that *B.R. never stated that*

*such research informed his opinions in this case.* This, too, is something the

majority cannot escape. The trial court's order excluding B.R. rightfully pointed

this out:

> Plaintiff notes [B.R.] published peer reviewed papers related to forklift design, including a paper specifically addressing the forklift at issue here and a technical paper on forklift safety. However, *Plaintiff provided no indication these papers were relevant to or supported [B.R.'s] opinions at issue here.*[4]

(emphasis added).

The majority opinion's manufactured emphasis on B.R.'s research also

reveals what little relevance the mere existence of this research has on B.R.'s

ultimate conclusions. While the majority opinion claims that B.R.'s research

"supports his conclusions that doors will not materially hinder operators from

exiting a forklift in an emergency" (Majority, p. 22), the record does not support

this conclusion. At most, the record before the trial court and this Court indicates

that B.R. conducted some sort of egress testing at some point in the past on a

similar forklift to the one at issue. However, for the reasons discussed in section

III, below, neither Hanshaw nor B.R. provided the trial court with the

---

[4] As with much of the trial court's application of section 490.065.2(1)(a)-(d), the majority opinion does not mention this portion of the trial court's decision, instead solely directing us to what it has cherry-picked as the "primary basis" of the trial court's decision, discussed below at page 22. I would urge the reader to consider the well-reasoned findings of the trial court interspersed throughout the dissenting opinions.

conclusions from that testing nor stated whether B.R. relied on such testing when coming to his conclusions.[5]  The majority opinion places undue emphasis on matters that, as the trial court rightfully determined, B.R. never indicated were relevant to or supported his opinions.

Because Hanshaw was the proponent of B.R.'s testimony, Hanshaw "bore the burden of establishing that [the] expert testimony satisfied the foundational requirements of [Section] 490.065.2(1)" in the trial court.  *State v. Antle*, 657 S.W.3d 221, 234 (Mo. App. W.D. 2021).  Hanshaw simply did not meet his burden.  The legal file contains all of the information the trial court had before it in deciding Crown's motion to exclude B.R.  Hanshaw's Legal File contains his memorandum in opposition to Crown's motion to exclude and supplemental materials as follows: B.R.'s curriculum vitae; his full deposition; the deposition of Crown's corporate representative; Hanshaw's deposition; and an affidavit from B.R. concerning his qualifications and the tasks he undertook in reviewing

---

[5] This should come as no surprise.  In the affidavit of B.R. attached to Hanshaw's Response to the motion to exclude, he specifically states that "a Power Point presentation was prepared that detail [sic] the primary opinion I will offer along with some of the source material upon which I relied.  That Power Point is attached as Exhibit 'B.'"  Yet, there is no Exhibit B attached to Expert's affidavit.  By his own affidavit, Expert directed the trial court to an absent exhibit for any discussion of his "primary opinion" and the materials upon which he relied.  Given the absence of his opinions, the source materials, and the methodology used to derive the conclusions, it becomes even more clear that the reliability prong of 490.065.2(1)(b)-(d) simply was not met, and why the majority opinion must rely on tertiary source material.

Hanshaw's case.[6]  As the proponent of B.R., Hanshaw had the duty to address how B.R. met section 490.065.2(1)(a)-(d)'s requirements.  Yet, a review of the majority opinion, and Hanshaw's argument both below and on appeal, fails to specifically provide how these requirements were met.

Rather, Hanshaw argues, and the majority opinion seems to accept, that B.R.'s opinions are reliable because he has "extensive experience" and that he "applied all that experience when he conducted his extensive review and analysis of the [subject forklift] involved in this case as well as Plaintiff Hanshaw's accident."  (App. Brief, p. 42).  Though we do not know their application to the events of this lawsuit, Hanshaw also points out B.R. has co-authored papers.  This is insufficient to satisfy Section 490.065.2(c) and (d), which requires an expert's opinions to be "the product of reliable principles and methods" and requires an expert to "reliably appl[y] the principles and methods to the facts of the case."  Essentially, Hanshaw argues that because B.R. is qualified, his opinions *must* be reliable.  Such ignores section 490.065.2(1)(a)-(d)'s requirements.

B.R.'s opinions do not satisfy Section 490.065 because Hanshaw does not meaningfully connect the facts of this case to his conclusions by explaining his methodology or provide data that supports his findings.  *See* Section 490.065.2(1)(c) ("The testimony [must be] the product of reliable principles and

---

[6] His supplemental materials were actually attached to his suggestions in opposition to summary judgment but have been interchangeably utilized for both that motion and his opposition to the motion to exclude expert.

methods."). We have nothing but the *ipse dixit*[7] statement of B.R. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146, 118 S.Ct. 512, 139 L.Ed.2d 508 (1997) (stating that a trial court is not required "to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert. A court may conclude that there is simply too great an analytical gap between the data and the opinion offered."). In short, we have B.R.'s qualifications (Section 490.065.2(1)(a)); we do not have, nor did the trial court have, the principles and methods or their application to the facts of the case (Section 490.065.2(1)(c)). Thus, we cannot say he reliably applied those principles and methods to the facts of the case in reaching his opinions, nor could the trial court do so.

This Court has recently affirmed a trial court's exclusion of an otherwise qualified expert when such expert did not offer reliable opinions. *See Gebhardt v. Am. Honda Motor Co.*, 627 S.W.3d 37, 46 (Mo. App. W.D. 2021).[8] In that case, we affirmed the trial court's exclusion of a mechanical engineer's opinion, finding that "there was an analytical gap between the limited data provided and [the proposed expert's] opinions." *Id*. at 45. The majority opinion seeks to discount that holding, again cherry picking from the well-reasoned *Gebhardt* decision while wholly ignoring its overarching determination: that the expert's methodology was not thorough, just as B.R.'s methodology is absent from the case at hand. *See id*. In

---

[7] *Ipse dixit* translates to "he himself said it."

[8] Notably, Hanshaw wholly ignores *Gebhardt*, our application of section 490.065.2's requirements included therein, and makes no effort to explain why the trial court erred in applying same.

finding section 490.065.2(1)(c) ("The testimony [must be] the product of reliable principles and methods") was not met, we clearly stated the proposed expert "did not thoroughly explain his methodology or point to studies, tests, publications, or other support for his findings." *Gebhardt*, 627 S.W.3d at 45. We explained, "[e]ven if [the expert's] theory was plausible, its speculative foundation and lack of confirmatory testing, third-party validation or other facts and data buttressing the reliability of the methods applied or conclusions produced provided the trial court a sufficient basis to exclude [the proposed expert's] testimony." *Id*. at 46.

Such an "analytical gap" exists in this case, despite the majority opinion's insistence that B.R.'s qualifications and previous work "bridge" the vast gap. B.R. never explains on the record in more than general terms how his actions in this case inform the opinions he formulated. For example, in B.R.'s affidavit filed with Hanshaw's Response, B.R. simply states, "In formulating my opinions, I have reviewed a host of materials and I conducted both in the past and specifically for this case, a number of analyses and tests [sic]." B.R. never explains how the "host of materials" or the "number of analyses and tests" that he conducted informs the opinions he has in this case, nor does he explain the methodology applied. Without explanation, we cannot determine whether B.R.'s "testimony is the product of reliable principles and methods" or if B.R. has "reliably applied the principles and methods to the facts of the case." *See* Section 490.065.2(1)(c)-(d).[9]

---

[9] We note that the majority has apparently gleaned B.R.'s 169-page deposition and located what B.R. purportedly "concluded." (Majority p. 28). However, we further note Hanshaw did not refer the trial court to this, or any other portion of B.R.'s

11

In insisting that there is no analytical gap in this case, the majority notes that B.R. concluded that Hanshaw's injury occurred because Hanshaw lost his balance and that this loss of balance caused Hanshaw's foot to exit the operator compartment of the forklift. The majority then notes that B.R. contends that this mechanism of injury would have been prevented if the subject forklift had a compartment door. But, to be clear, it was a contested factual issue whether Hanshaw intentionally exited the forklift or if his leg was outside of the forklift due to a loss of balance,[10] and as discussed at oral argument, it was also a contested

---

deposition *at all* in his Response. Further, the majority's effort to 'connect' B.R.'s deceleration and lateral acceleration conclusion to a reason for injury "which would have been prevented by the addition of a compartment door," (Majority p. 28), is not a connection B.R. rendered in such discussion. Rather, when discussing deceleration and lateral acceleration, B.R., by process of eliminating a "fend off" and a "jump situation" (the other two "primary failure modes") was simply rationalizing why Hanshaw's foot was outside the compartment; B.R. was not tying cause and prevention together as the majority suggests. Accordingly, while I disagree this is the great elixir necessary to satisfy the requirements of section 490.065.2(1)(c)-(d), it highlights what I have said previously: that the majority has done what Hanshaw could (and should) have done at the trial court level, but did not.

[10] For background, Hanshaw was injured on the fourth day of his employment and the injury was captured on surveillance video. Multiple entities investigated the accident. Hanshaw's employer's investigation included a report indicating that Hanshaw had told the warehouse lead and another fellow employee that he had panicked and jumped out of the forklift. This report indicated that Hanshaw had been asked what happened after the accident and that Hanshaw had said, "I was going to go around the wrapper and turned the wrong way. I panicked and tried to jump out of the way." An OSHA report indicated: "The employee either attempted to jump out or push off the pole with his foot but got his foot caught in between the pole and the forklift."

In his deposition, Hanshaw testified that the only thing he remembered about the collision was lifting his foot off of a switch to activate the E-brake and then being on the ground after the accident; that he did not remember making the statements in his employer's report; that he had never given OSHA a statement when OSHA tried contacting him multiple times; and that he disagrees with the notion that he attempted to jump out of the forklift or push off of the pole with his foot.

issue whether a door would have prevented Hanshaw's injury even if Hanshaw's leg was inadvertently outside of the operator compartment depending on the door's design and function. I am, of course, aware that contested factual issues are not decided on a motion to exclude or a motion for summary judgment. I simply point out these contested factual issues because they provide helpful background for illustrating why the majority reaches too far in asserting that B.R. (who has never designed a component part of any piece of material handling equipment) can reliably opine that a door would have prevented Hanshaw's injury without reference to the specific function and design of the door.

As Crown pointed out at oral argument, doors open, and how they open matters. Nothing in the record indicates that B.R.'s proposed spring-loaded door would have prevented the injury in this case (even under B.R.'s factual theory), given that a spring-loaded door opens when a person falls against it. Further, B.R.'s deposition (albeit a part to which the trial court was never directed) indicated that his other recommended design was a latching door that would be opened with a crash bar (similar to bars that open doors in a school gym) that would be placed directly next to the operator's hip, that would be opened by contact with the operator's hip, and that would not come equipped with a device that would prevent the door from opening upon inadvertent contact with the operator's hip. The lack of details regarding B.R.'s proposed designs, and the fact that he seemed to suggest that one door was as good as another without regard to how they functioned, was absolutely relevant to whether B.R. could *reliably* opine regarding

13

what injuries a door would have prevented. As the trial court accurately recognized: "[B.R.] testified he added a door to a forklift, but did not offer testing results in support of his design options." In contending that there was no analytical gap between B.R.'s designs and Hanshaw's injury, the majority appears to take the position that B.R. took – that one door would be as good as another – which, as Crown points out, suggests a lack of understanding regarding the importance of design details.

Further, in his deposition, B.R. acknowledged his lack of testing:

Q: Have you conducted any tip-over testing where you actually tipped a Crown stand-up rider forklift with or without a dummy just to measure forces, anything such as that?

A: No, sir.

Q: Have you ever conducted any stand-up rider testing using any type of forklift and somehow getting it to go off a dock, measuring forces or measuring rotations, anything such as that?

A: No.

B.R. also testified:

Q: And I want to take this next question broader than just the Crown trucks. Have you ever done any injury potential testing involving stand-up rider forklifts and anthropomorphic dummies where you could measure the forces on those dummies involving any manufacturer's stand-up rider forklifts?

A: No.

In short, B.R. has done nothing to quantifiably determine how his proposed door designs would impact operator safety.[11]

---

[11] Federal courts have excluded similar design proposals in other defective design cases involving forklifts. *See Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 867 (7th

The majority opinion points out that the law does not require B.R. to conduct such "injury potential testing" and that the trial court erred in applying such a "stringent" standard when evaluating B.R.'s opinions. (Majority p. 16). We note, however, that this is contrary to our *Gebhardt* opinion which specifically stated that "speculative foundation and lack of confirmatory testing, third-party validation or other facts and data buttressing the reliability of the methods applied or conclusions produced" provide a sufficient basis for the trial court to exclude an expert's testimony. *Gebhardt*, 627 S.W.3d at 46. Regardless, where the record is replete with what B.R. did not do and scant as to what B.R. did do to draw his conclusions the absence of any meaningful testing further undermines the reliability of B.R.'s opinions.

In short, the record in this case does not demonstrate that B.R.'s opinions are based on "reliable principles and methods" as required by Section 490.065.2(1)(c). The record before us is notable only for what B.R. *did not* do in this case and contains little information on what B.R. *did* to come to his opinions. As such, B.R.'s opinions are not the product of reliable principles and methods and

Cir. 2001) ("When, as in this case, an expert has not engaged in any type of testing of his offered 'alternative design,' it is not an abuse of discretion for the district court to refuse to allow such testimony."); *Lawrence v. Raymond Corp.*, No. 3:09 CV 1067, 2011 WL 3418324 at *7 (N.D. Ohio Aug. 4, 2011) (finding that because the expert's alternative design "strongly lend themselves to testing" and "[a]s such, his testing is perhaps the most important factor."); *Ortiz v. Yale Materials Handling Corp.*, No. CIV 03-3657FLW, 2005 WL 2044923 at *6-*10 (D. N.J. Aug. 24, 2005) (finding the expert's opinion unreliable because he never performed any dynamic testing with a forklift, had never completed any computer simulations with his proposed door design, and had never completed any analysis on adding a latching door to the forklift at issue in the case).

15

do not satisfy Section 490.065.2(1)(c).  Consequently, B.R.'s opinions also do not satisfy Section 490.065.2(1)(d), which requires an expert to reliably apply those principles and methods to the facts of the case.

Hanshaw argues B.R.'s opinions are reliable because he "applied his extensive engineering experience and his experience evaluating, testing, and operating forklifts to the facts of Mr. Hanshaw's accident."  The majority opinion adopts a similar approach and focuses on B.R.'s qualifications and absent writings to support his opinions.  While B.R.'s qualifications are significant, they alone are insufficient to establish that the trial court abused its discretion in exercising its gatekeeping function and finding that his opinions were not sufficiently reliable.

III.   **Hanshaw's Failure to Address the Reliability Requirements of Section 490.065.2(1)(b)-(d) Should Come as No Surprise Given That He Quotes and Applies the Incorrect, Former, Version of Section 490.065 in His Response to the Motion to Exclude.**

Hanshaw simply did not meet his burden before the trial court, but this cannot come as a surprise.  From the outset, Hanshaw's Response and Memorandum in Opposition to Defendant Crown Equipment Corporation's Motion to Exclude [B.R.] ("Hanshaw's Response" or "Response") in the trial

16

court utilized the incorrect, former, version of section 490.065.[12] *See* Section I, above. This renders it clear how and why Hanshaw failed to address current section 490.065.2(1)(b)-(d)'s reliability prong, and buttresses the trial court's decision. From the outset, Hanshaw failed to state the correct law applicable to his case, failed to acknowledge the correct standard, and accordingly, could not make a serious attempt to show that the requirements of section 490.065.2(1)(a)-(d) were met. A review of Hanshaw's Response is appropriate to properly understand what Hanshaw presented to the trial court, and thus why the trial court excluded B.R.

On page 1 of his Response, Hanshaw asserts "Crown's Motion to Exclude fails because [B.R.] is qualified as an expert under [section] 490.065.2. As held by the Missouri Supreme Court, the remaining factors of the analysis . . . go to the weight the jury is to give his opinions, not their admissibility." (emphasis added). For this proposition, Hanshaw cites *Kivland v. Columbia Orthopaedic Grp., LLP*, 331 S.W.3d 299, 311 (Mo. banc 2011). Hanshaw's emphasis solely on B.R. being "qualified" is simply incorrect, given that pursuant to the current version of section 490.065.2 an expert must be qualified and his opinions must meet the four requirements of the reliability prong. Further, the requirements of the reliability prong do not simply "go to the weight," as Hanshaw alleges in citing

---

[12] Though Hanshaw *cited* the currently applicable version, section 490.065.2, the verbiage quoted and applied is the former section 490.065 in its entirety, as discussed below.

*Kivland*, but rather must be met just as the "qualified" requirement is met. And, *Kivland* simply does not address the four requirements of the reliability prong in the current section 490.065.2(1)(a)-(d); *Kivland* was decided six years prior to the 2017 amendment to Section 490.065. How Hanshaw could suggest that the "remaining factors of the analysis," i.e. the reliability requirements, simply "go to the weight" is simply an inaccurate recitation of today's law. *Nowhere in his Response* does Hanshaw assert that B.R.'s opinions satisfy the reliability requirements of section 490.065.2(1)(a)-(d); *these requirements are not even identified.*

Further, in setting forth the legal standard used in his Response, Hanshaw doubles down, again quoting *Kivland*, "The statute simply provides that the circuit court is responsible for determining whether (1) the expert is qualified; (2) the expert's testimony will assist the trier of fact; (3) the expert's testimony is based upon facts or data that are reasonably relied on by experts in the field; and (4) the facts or data on which the expert relies are otherwise reasonably reliable." *Kivland*, 331 S.W.3d at 310-11. This does nothing more than paraphrase the former section 490.065.

And, finally in his Response, Hanshaw quotes the *former* section 490.065 *in toto*,[13] not the current version of 490.065 rightly applicable to this case.[14] Hanshaw then quotes *Kivland* again, stating, "[These] straightforward statutory words are all you really need to know about the admissibility of expert testimony in civil proceedings." *Kivland*, 331 S.W.3d at 311 n.14. The majority simply cannot get around this detail.

Hanshaw's reliability discussion presented to the trial court consists of a single page in his Response. Here, Hanshaw makes fleeting reference to *State ex rel. Gardner v. Wright*, 562 S.W. 3d 311, 319 (Mo. App. E.D. 2018), his *only* reference to caselaw decided after current section 490.065 was enacted. In a single sentence, he quotes *Gardner*, stating that "[t]estimony is reliable if is "based on sufficient facts or date, reliable principles and methods and reliable application thereof."" Yet, he makes no effort to apply same, nor does he attempt to address current section 490.065.2(1)(b)-(d) anywhere else in his Response. Rather, Hanshaw pivots his "reliability" discussion, citing various pre-2017 cases for the general standard as to when evidence of similar accidents is admissible. He does not relate these cases to the admissibility requirements of B.R.'s

---

[13] As previously stated in n.3, the current section 490.065.1 is nearly identical to former section 490.065. Here, however, it is evident Hanshaw mistakenly quoted (and then applied) the former statute because the quote lacks the prefatory language contained in current section 490.065.1.

[14] The majority opinion and I agree that the current version of the statute is rightly applicable to this case. *See Stiers v. Dir. of Revenue*, 477 S.W.3d 611, 618 (Mo. banc 2016); *State ex rel. Tipler v. Gardner*, 506 S.W.3d 922, 925 (Mo. banc 2017) ("[T]he rules of evidence in effect at the time of trial govern.").

testimony under section 490.065.2(1), and indeed they in no way relate to it. Hanshaw concludes his *one-page* "reliability" argument[15] to the trial court by once again referring back to his tried and true – and incorrect – argument that Crown's arguments to exclude B.R.'s testimony is "only relevant to the persuasiveness of [B.R.'s] opinions, and *thus go to the weight of the evidence and not its admissibility*." (emphasis added).

In truth, current section 490.065.2(1)(a)-(d) was simply not addressed. Hanshaw never sought to make any kind of showing as to the bases for B.R.'s opinions – such as the facts, data, principles or methods, underlying any of his opinions as required by current section 490.065.2(1)(b)-(d), nor did he provide the opinions themselves. Hanshaw failed in these respects despite having the burden to establish the admissibility of B.R.'s testimony. [16]

---

[15] To the extent Hanshaw mentions reliability in his Response, it appears to refer to "reliable" as it is used in former section 490.065.3 ("The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing and must be of a type reasonably relied upon by experts in the field in forming opinions or inferences upon the subject and must be otherwise reasonably reliable."). In his two-paragraph reliability argument, Hanshaw states, "the arguments raised by [Crown] does [sic] not render the testimony inadmissible pursuant to section 490.065.2. The differences identified by [Crown] are only relevant to the persuasiveness of [Expert's] opinions, and thus go to the weight of the evidence and not its admissibility," once again in reference to the aforementioned Kivland quote regarding former section 490.065.

[16] In fact, the only evidence to which he cited in his Response were B.R.'s aforesaid curriculum vitae and affidavit. Though the majority has threaded together pieces of B.R.'s deposition to ostensibly present his conclusion, Hanshaw himself refers us solely to matters outside the record for same. Upon being asked at oral argument where in the record we could find B.R.'s opinion, Hanshaw's counsel referred this court solely to a PowerPoint presentation, a "multi-slide recitation . . . of [B.R.'s] opinions." Yet, as the majority pointed out to counsel during such argument, this PowerPoint was not part of the record. Further, when asked why he was making a distinction between

20

Being generous, it is clear Hanshaw suffers under some level of misunderstanding of the current law. He has misquoted the law and applied case law which set forth the framework of the prior statute. Given this, and other missteps mentioned herein, it is clear Hanshaw misapprehended the current state of the law in his Response to Crown's motion to exclude B.R.

This misapprehension of the applicable standard of law not only affects Hanshaw's legal argument, it affects what *evidence* he provided the trial court in his Response. As discussed in prior sections, Hanshaw did not demonstrate what facts or data B.R. considered in forming his opinions as required in section 490.065.2(1)(b), how B.R.'s opinions were the product of reliable principles and methods as required in section 490.065.2(1)(c), or how B.R. reliably applied the principles and methods he used to the facts of the case as required by section 490.065.2(1)(d). It comes as no surprise that the evidence Hanshaw provided with his Response did not demonstrate these matters, for Hanshaw's

---

the federal rule and the post-2017 statute that almost directly tracks the federal rule, counsel for Hanshaw stated, "because in Missouri unlike federal court, your basing a ruling on the efficacy [sic] of expert testimony strictly and almost exclusively on the record that the defense creates by deposing the expert." This is simply not the case. Hanshaw acts as if he is simply a bystander in a motion to exclude, yet it is clear that as the proponent of expert testimony, Hanshaw "bore the burden of establishing that [the] expert testimony satisfied the foundational requirements of [Section] 490.065.2(1)" in the trial court. *State v. Antle*, 657 S.W.3d 221, 234 (Mo. App. W.D. 2021). Counsel for Hanshaw was then asked, could he not have requested a hearing at which he could have presented evidence regarding the admission of his expert, to which he replied "[n]o question about it." Yet, curiously, counsel repeatedly pointed out that Hanshaw did not object to no hearing being held. Such references simply compound the problem of proof inherent in pleading and attempting to support his expert using the former statutory scheme.

21

misapprehension of the current law dictated what materials he presented to the trial court in support of his position.  In short, this Response was not prepared to address the current statute, nor did it provide the necessary exhibits to address the current statute, and to no surprise, if failed in any attempt to do so.

Must we have any further indication of what Hanshaw was attempting to prove in preparing his Response and the exhibits thereto for the trial court's consideration?  In a nutshell, this explains the "analytical gap" found by the trial court.  This was the argument presented to the trial court and the majority simply cannot get around that.

Despite having the burden to establish the admissibility of B.R.'s testimony, this Response and its attached materials are all that Hanshaw armed the trial court with to render a decision as to whether to exclude B.R.  Now, at the appellate level, Hanshaw's trouble is that he is confined to the trial court's record, a record which was not prepared to prove out section 490.065.2(1)(b)-(d)'s requirements.  This is also why the majority opinion must manufacture the argument Hanshaw could have made, but did not, at the trial court level.  The majority opinion fails to mention any of these noteworthy errors.

IV.    **Based Upon Our Standard of Review, The Trial Court Did Not Abuse Its Discretion.**

The trial court found that Hanshaw failed in his task of meeting the requirements of *current* section 490.065.2(1).  This should come as no surprise to Hanshaw.  In quoting, applying, and presenting the trial court evidence

22

regarding a statute that had been completely overhauled, how could his argument to the trial court result in anything more?

Hanshaw simply failed in his burden of meeting the requirements of section 490.065.2(1)(b)-(d). The majority opinion is quick to criticize the trial court about its recitation of the record; yet, it is the majority opinion that strays from the circumstances then before the trial court. The majority opinion claims that the trial court abused its discretion in failing to find B.R.'s opinions reliable; however, the majority opinion's claims are based solely on assertions from B.R. that he reliably reviewed undisclosed reports and data. Here, it is the majority opinion that tries to address what Hanshaw could have, but did not, and which Hanshaw failed to make part of the record. The trial court is simply not required to blindly accept B.R.'s own self-serving, *ipse dixit*, assertions about the bases for his decision in light of section 490.065.2(1)(b)-(d).

By way of example, the majority opinion notes that B.R. testified in his deposition that he conducted tests of egress times from a forklift similar to the subject forklift with a door attached. The trial court recognized this in its order, and noted that B.R. had claimed to have attached a door to a forklift similar to the subject forklift, but found that no results of such testing had been provided. The trial court recognized that B.R. indicated that he had conducted some testing, but noted: "[B.R.] has not shown the reliability of this testing and how it relates to and supports his proffered designs." In doing so, the trial court applied the requirements set forth by the legislature in section 490.065.2(1)(b)-(d).

23

Nevertheless, the majority opinion ignores the trial court's reasons for granting the motion to exclude and engages in criticisms based on the trial court's refusal to blindly accept as reliable a study that was not before the trial court. Apparently, the majority opinion takes the position that the only thing a trial court needs to evaluate when determining whether testing has been conducted reliably is the proffered expert's descriptions of the testing, without results, and regardless of whether such expert states that he actually relied on such testing. Such a position misstates the law and does nothing to show B.R.'s opinions are the product of reliable principles and methods in conformance with section 490.065.2(1)(c), or to show that section 490.065.2(1)(d) was met.

The majority opinion is also critical of the trial court, stating the "primary basis on which the circuit court found [Proposed] Expert's opinions to be unreliable was because '[h]e cannot point to any door design or bumper he has developed, prototyped, or tested, or any testing to measure the injury potential to stand-up forklift operators in off-dock and tip-over accidents on forklifts equipped with a door or bumper.'" (Majority p. 16). The majority opinion indicated that this statement misapplied the law and misstated the record. Though labeling this as the trial court's "primary basis" for determining B.R. to be unreliable is convenient to the majority opinion's narrative, it is simply not the case, nor does the statement misapply the law. Rather, just as we did in *Gebhardt*, the trial court noted the lack of testing conducted by B.R. and noted

24

that B.R. had not shown the reliability of the testing he had performed or how it related to and supported his opinions. *See Gebhardt*, 627 S.W.3d at 46.

The most compelling basis upon which the trial court found B.R. to be unreliable is its learned analysis addressing section 490.065.2(1)(b)-(d). The trial court acknowledged that Hanshaw had indicated that B.R. had published papers, but specifically stated Hanshaw gave the trial court no indication how the papers were relevant to or supported the opinions at issue:

> Plaintiff notes [B.R.] published peer reviewed papers related to forklift design, including a paper specifically addressing the forklift at issue here and a technical paper on forklift safety. However, *Plaintiff provided no indication these papers were relevant to or supported [B.R.]'s opinions at issue here.* Plaintiff contends for this case, [B.R.] analyzed Crown's accident data reported by Crown and OSHA data regarding accidents and injuries and used this information in developing his opinions, *but he did not demonstrate how he used the data, how the data supported his opinions, and whether his use of the data was acceptable in the scientific community. Failure to thoroughly explain methodology to support expert opinion weighs in favor of exclusion. Gebhardt v. Am. Honda Motor Co.*, 627 S.W.3d 37, 45 (Mo. Ct. App. 2021) (speculative foundation and lack of confirmatory testing, third-party validation or other facts and data buttressing the reliability of the methods applied or conclusions is a sufficient basis to exclude); *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001) (without a detailed explanation of methodology, a court cannot assess the reliability of the testimony).

(emphasis added). Regarding the bases for B.R.'s opinions, the circuit court found that Hanshaw failed to explain the methodology behind B.R.'s opinions. And, ironically, the majority opinion is absolutely silent on the trial court's fundamental analysis which utilized this Court's *Gebhardt* analysis.

In short, in following the *Gebhardt* analysis, the trial court did what the majority opinion has yet to do; specifically follow section 490.065.2(1)(a)-(d)'s requirements to determine reliability. But then, neither the majority opinion nor Hanshaw could follow section 490.065.2(1)(a)-(d)'s requirements given that Hanshaw quoted and applied former section 490.065, which naturally permeated the evidence he produced for the trial court's consideration, and ours.

"We 'will affirm on any ground that supports the circuit court's judgment, regardless of the grounds on which the circuit court relied.'" *KC Air Cargo Servs., Inc v. City of Kan. City*, 581 S.W.3d 685, 690 n.3 (Mo. App. W.D. 2019) (quoting *Stanley v. State*, 420 S.W.3d 532, 543 n.9 (Mo. banc 2014)). The majority opinion is highly critical of the trial court's determination that B.R. was not qualified, and that criticism monopolizes the majority opinion. Here, however, regardless of the trial court's determination of qualification, its determination that B.R.'s opinions were not reliable pursuant to section 490.065.2(1)(b)-(d) is sufficient to affirm the trial court's decision.

"The circuit court 'enjoys considerable discretion in the admission or exclusion of evidence.'" *Shallow v. Follwell*, 554 S.W.3d 878, 881 (Mo. banc 2018) (quoting *Lozano v. BNSF Ry. Co.*, 421 S.W.3d 448, 451 (Mo. banc 2014)). "A circuit court abuses its discretion when its 'ruling is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration.'" *Shallow*, 554 S.W.3d at 881 (quoting *Lozano*, 421 S.W.3d at 451).

26

"'If reasonable persons can differ as to the propriety of the trial court's action, then it cannot be said that the trial court abused its discretion.'" *Sherry v. City of Lee's Summit*, 623 S.W.3d 647, 658 (Mo. App. W.D. 2021) (quoting *Lozano*, 421 S.W.3d at 451)).

I have previously set forth the two very different versions of section 490.065; the pre-2017 former version and the post-2017 current version. I have also set forth Hanshaw's recitation and application of the incorrect, pre-2017 former version, as well as his reliance on pre-2017 caselaw to bolster his case. This rendered Hanshaw's Response and the arguments therein of little assistance to the trial court. Further, one must recognize that along with his application of the wrong version of the statute, the documentation provided with his Response to the motion to exclude B.R. was necessarily hampered by the same misunderstanding of the law. In short, Hanshaw provided the trial court with materials *which supported only his pre-2017* former 490.065 arguments. Given the additional requirements contained in current section 490.065.2(b)-(d), it is apparent additional materials to support these requirements would be necessary, and our record fails to support these additional requirements. Under these circumstances, where the trial court applied our most recent application of section 490.065 in *Gebhardt* to a Response and accompanying exhibits put together to meet a former version of the statute, the trial court's ruling was not clearly against the logic of the circumstances then before the court and was not so unreasonable and arbitrary so as to shock the sense of justice or indicate a lack of careful, deliberate

consideration.  *See Shallow*, 554 S.W.3d at 881.

## Conclusion

For these reasons, I would affirm the trial court's decision.  To that extent,

I respectfully dissent from the majority opinion.

W. Douglas Thomson, Judge

J. Chapman, concurring.



# IN THE MISSOURI COURT OF APPEALS
## WESTERN DISTRICT

CHRISTOPHER HANSHAW, )
)
        Appellant, )
)
v. ) WD86389
)
CROWN EQUIPMENT CORP., ET AL, ) Filed: April 1, 2025
)
        Respondent. )

## DISSENTING OPINION

I join Judge Thomson in his well stated dissent and write separately, as I wish to put a finer point on the majority's failure to fully respect the circumstances before the trial court when it was assessing the admissibility of B.R.'s opinions, and its resulting failure to respect the standard of review. The majority ignores the fact that Hanshaw failed to acknowledge or attempt to satisfy the reliability requirements set forth in section 490.065.2. Similarly, the majority fails to appreciate the materials to which the trial court was directed. The majority then goes on to fault the trial court for accurately assessing the record before it, and appears to take the unfounded position that trial courts are required to assume that a proffered expert's opinions are reliably formed simply because the expert claims they are based on testing or analysis that the expert need not disclose to

the trial court. Because the trial court did not abuse its discretion in determining that Hanshaw failed to satisfy the burden of establishing that B.R.'s opinions were reliably formed, I would affirm the trial court's judgment.

## I.

The circuit court "enjoys considerable discretion in the admission or exclusion of evidence." *Shallow v. Follwell*, 554 S.W.3d 878, 881 (Mo. banc 2018) (quoting *Lozano v. BNSF Ry. Co.*, 421 S.W.3d 448, 451 (Mo. banc 2014)). "The admission or exclusion of evidence will not be grounds for reversal absent a clear abuse of discretion." *Id.* "A circuit court abuses its discretion when its ruling is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Id.* (internal quotations omitted).

## II.

Section 490.065 governs the admission of expert testimony in Missouri courts. Since August 28, 2017, there are two separate standards that may apply depending on the type of action brought. *Compare* § 490.065.1 (setting forth one standard to govern in certain categories of cases), *with* § 490.065.2 (setting forth a distinct standard to govern in all other cases). "[T]he rules of evidence in effect at the time of trial govern." *Stiers v. Dir. of Rev.*, 477 S.W.3d 611, 618 (Mo. banc 2016); *State ex rel. Tipler v. Gardner*, 506 S.W.3d 922, 925 (Mo. banc 2017).

Section 490.065.2 governs the admissibility of expert testimony in this case. As relevant to this case, section 490.065.2(1) provides:

2

(1) A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise *if*:

(a) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) The testimony is based on sufficient facts or data;

(c) The testimony is the product of reliable principles and methods; *and*

(d) The expert has reliably applied the principles and methods to the facts of the case[.]

(emphases added). The plain language of this standard makes clear that a witness who is qualified as an expert may provide opinion testimony and other testimony *if* four additional requirements are *also* met. In other words, the statute makes it clear that qualification alone is not enough; rather, a proponent of a proffered expert must also make a sufficient showing regarding the four *additional* requirements. *See* § 490.065.2(1)(a)-(d).[1]

---

[1] Although the above interpretation follows from the plain language of section 490.065.2, the history of section 490.065.2 further reinforces this uncontroversial interpretation. When the General Assembly enacted the standard currently set forth in section 490.065.2(1), it adopted word-for-word the standard set forth in Rule 702 of the Federal Rules of Evidence (as the Rule existed following the 2011 amendments to Federal Rule 702). Although minor stylistic alterations were made to Federal Rule 702 in 2011, the prior 2000 amendments to Federal Rule 702 remained the substantive form that Federal Rule 702 held when adopted by Missouri in 2017. The Advisory Committee Notes to the 2000 Amendments explained these substantive changes and reinforced what was clear from Rule 702's language – that Rule 702's requirements were indeed requirements:

Rule 702 has been amended in response to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and to the many cases applying *Daubert*, including *Kumho Tire Co. v. Carmichael*, 119 S.Ct. 1167 (1999). In *Daubert* the Court charged trial judges with the responsibility of acting as gatekeepers to exclude unreliable expert testimony, and the Court in *Kumho* clarified that this gatekeeper function applies to all expert testimony, not just

3

## III.

The majority opinion fails to give due regard to the circumstances before the trial court. As a result, the majority opinion fails to properly apply our standard of review. Instead of evaluating the circumstances before the trial court, the majority faults the trial court for failing to consider arguments and materials that Hanshaw never presented to the trial court and for failing to independently review the lengthy exhibits attached to the summary judgment materials in light of the presentation that Hanshaw could have made but did not.

### A.

In response to the motion to exclude filed by Crown Equipment Corporation ("Crown"), Hanshaw carried the burden of establishing that the requirements of section 490.065.2(1) were met. *See State v. Antle*, 657 S.W.3d 221, 234 (Mo. App. W.D. 2021). However, Hanshaw's response to the motion to exclude failed to set forth the applicable standard under section 490.065.2(1). Instead, Hanshaw set forth an inapplicable version

---

testimony based in science. See also *Kumho*, 119 S.Ct. at 1178 (citing the Committee Note to the proposed amendment to Rule 702, which had been released for public comment before the date of the *Kumho* decision). The amendment affirms the trial court's role as gatekeeper and provides some general standards that the trial court must use to assess the reliability and helpfulness of proffered expert testimony. Consistently with *Kumho*, the Rule as amended provides that all types of expert testimony present questions of admissibility for the trial court in deciding whether the evidence is reliable and helpful. Consequently, the admissibility of all expert testimony is governed by the principles of Rule 104(a). Under that Rule, the proponent has the burden of establishing that the pertinent admissibility requirements are met by a preponderance of the evidence. See *Bourjaily v. United States*, 483 U.S. 171 (1987).

Advisory Committee Notes, Fed. R. Evid. 702 (2000).

4

of the statute, asserted that his expert was qualified, argued that qualification was dispositive, and argued that everything else went to the weight the jury was to give B.R.'s opinions, rather than their admissibility. After failing to acknowledge the requirements set forth in section 490.065.2(1)(b)-(d) regarding reliability, Hanshaw unsurprisingly failed to make a legitimate attempt to satisfy such requirements.

As relevant, Hanshaw's response to the motion to exclude indicated that B.R. would opine that the open operator compartment of the subject forklift renders it defective. Hanshaw's response presented an argument regarding B.R.'s qualifications. At the end of that argument regarding qualification, Hanshaw asserted that "the fact that [B.R.] is qualified as an expert under the statute is dispositive of the exclusion effort against him because the other factors of the analysis go to [*sic*] weight of his opinions, not their admissibility." Hanshaw cited to a 2011 Missouri Supreme Court for this proposition. *See Kivland v. Columbia Orthopaedic Grp., LLP*, 331 S.W.3d 299, 311 (Mo. banc 2011).

However, *Kivland* was handed down in 2011. The standard set forth in section 490.065.2 did not exist in Missouri law until 2017. *Kivland* certainly cannot be understood as interpreting a statute that did not then exist. The plain language of section 490.065.2 makes clear that the current standard contains reliability requirements that must be met.[2]

---

[2] Moreover, the standard addressed in *Kivland* still exists and governs the admission of expert testimony in certain categories of cases. *See* § 490.065.1. It cannot be (and is not) the case that the legislature intended to adopt a new and distinct standard in section 490.065.2, and yet intended that new standard to be interpreted in exactly the same manner as the prior standard.

5

After having argued that qualification was dispositive, Hanshaw's response to the motion to exclude failed to present arguments to the trial court relevant to reliability and failed to direct the trial court to materials that would satisfy the reliability requirements of section 490.065.2, such that Hanshaw's showing regarding reliability amounted to little more than a conclusory assertion that B.R.'s opinions were reliable. After arguing that qualification was dispositive and making the conclusory assertion that B.R.'s opinions were reliable, Hanshaw's response to the motion to exclude cited inapposite case law that did not bear on the admissibility of expert testimony. Hanshaw then asserted under a separate bold heading that "[B.R.] is permitted to offer alternative safe designs." Hanshaw then noted that evidence of a reasonable alternative design may be introduced in a design defect action and that B.R. opines that the installation of a door on the subject forklift "would improve its overall safety." Hanshaw then indicated that B.R. derived this opinion after obtaining a predecessor to the subject forklift and attaching a door to it.

In determining whether the trial court abused its discretion, appellate review necessarily examines whether the trial court's ruling "is clearly against the logic of the circumstances then before the court and is so unreasonable and arbitrary that it shocks the sense of justice and indicates a lack of careful, deliberate consideration." *Shallow*, 554

---

Missouri courts have long recognized that the power to prescribe or alter rules of evidence rests with the legislature. *See State Bd. of Registration for Healing Arts v. McDonagh*, 123 S.W.3d 146, 154 n.10 (Mo. banc 2003) (citations omitted). Nevertheless, Missouri courts regularly cite to *Kivland* as though it was a case interpreting section 490.065.2 when *Kivland* does no such thing. In fact, in *Kivland* the Missouri Supreme Court made abundantly clear that the statutory language governs the admissibility of expert testimony in Missouri. *See Kivland*, 331 S.W.3d at 310 n.14 (citation omitted). Thus, even if *Kivland* stood for the proposition that Hanshaw suggests, *Kivland* would be inapposite in light of the statutory amendments.

S.W.3d at 881. Here, the circumstances before the trial court included Hanshaw's failure

to acknowledge the statutory requirements regarding reliability, his incorrect assertion

that qualification was dispositive, and his corresponding failure to provide a meaningful

basis to support his assertion that B.R.'s design-defect opinions were reliable. By

ignoring these circumstances, the majority essentially takes the position that it is

completely unnecessary for a proponent of expert testimony to present relevant

arguments to the trial court in response to an effort to exclude expert testimony. Instead,

the majority appears to suggest that the trial court is required to sift through the record

before it in light of arguments that could have been but were not presented to the trial

court.[3]

---

[3] The majority opinion propagates the confusion suffered by Hanshaw (that qualification is dispositive) by repeating statements from cases out of context, such that the majority's standard has a high potential to mislead. The majority cites a footnote in *Linton* for the proposition that "[s]o long as the expert is qualified, any weakness in the expert's knowledge is for the jury to consider in determining what weight to give the expert." *See Linton by & through Linton v. Carter*, 634 S.W.3d 623, 628 n.5 (Mo. banc 2021) (quoting *Kivland*, 331 S.W.3d at 311). Although this statement originated from *Kivland*, a case interpreting a different statutory standard, the Missouri Supreme Court in *Linton*, by repeating this statement in a footnote while interpreting the current version section 490.065.2, provided some indication that the statement could apply to the current version of section 490.065.2. However, *Linton* also made absolutely clear, in the body of the opinion, that "[e]xpert testimony in civil cases is inadmissible unless it satisfies the evidentiary requirements of section 490.065." *Id.* at 626.

*Linton* also made clear that, for cases governed by section 490.065.2, the evidentiary requirements include those expressly set forth in section 490.065.2(1)(a)-(d). *See Linton*, 634 S.W.3d at 626 & n.4. Regarding whether alternative causation testimony is admissible, *Linton* concluded that it was admissible when it met the statutory requirements. *Id.* at 628. And, in addressing whether the expert testimony was admissible in the case then before the court, *Linton* clearly indicated that it found the proffered testimony was admissible because the expert was qualified, *and* because the record was "replete with proof" that the expert "applied reliable principles and methods to the facts" of the case that could aid the trier of fact. *Id.* at 630. Thus, the *Kivland* quote footnoted in *Linton* is clearly addressed to assessing qualification and is not accurate in a wider context unless it is understood to presume that the other admissibility requirements have also been satisfied. In spite of the patently obvious confusion suffered by

7

**B.**

In the majority's efforts to overlook the flaws with Hanshaw's response to the motion to exclude, the majority faults the trial court for failing to scour the lengthy summary judgment record independently for materials beneficial to Hanshaw without regard to whether Hanshaw directed the trial court to such materials and without regard to whether the summary judgment materials that Hanshaw ***did*** cite would support a conclusion that B.R. had reliably formed his opinion that the subject forklift was defectively designed due to its open operator compartment.

The majority asserts that the trial court was provided all of the materials necessary to assess the reliability of B.R.'s design-defect opinions. The majority asserts that B.R.'s deposition and affidavit were provided to the trial court in opposing Crown's motion to exclude. The majority even asserts that Hanshaw's response to the motion to exclude included citations to B.R.'s deposition despite the fact that Hanshaw's response to the motion to exclude did not include a single citation to B.R.'s deposition. Based on these assertions, the majority then takes the apparent position that the trial court was required

_____

Hanshaw in his response to the motion to exclude, the majority nevertheless presents the standard in a way that compounds such confusion going forward, by selectively quoting a footnote from *Linton* that in turn quoted an earlier case interpreting a different statute not applicable here.

The majority also quotes *Crowder* for the proposition: "If the expert is sufficiently qualified, . . . the decision to accept his or her analysis of the facts and data is for the jury to decide." *See Crowder v. Ingram Barge Co.*, 681 S.W.3d 641, 646 (Mo. App. E.D. 2023). This statement, taken out of context, is simply not an accurate representation of the admissibility standard. The majority apparently takes the position that a proponent of expert testimony does not need to put forth an argument regarding reliability, giving the erroneous impression that the reliability requirements expressly set forth in a rule of evidence created by the General Assembly are optional. They are not.

8

to sift through the entirety of B.R.'s 169-page deposition for passages favorable to Hanshaw regardless of whether Hanshaw directed the trial court to such passages. The problem with the majority's assertions is that these assertions do not accurately describe the record and do not properly apply the appellate standard of review.

Hanshaw responded to Crown's motion for summary judgment and motion for exclusion with a sequence of filings on the same day. Hanshaw filed a response to the summary judgment motion, which included a statement of additional facts, and five attached exhibits, including B.R.'s affidavit and B.R.'s 169-page deposition. Hanshaw filed a response to Crown's motion to exclude shortly thereafter.

I recognize that the exclusion proceedings and the summary judgment proceedings were briefed in short succession and that some of the materials had some relevance to both proceedings. However, I note that Crown's summary judgment motion was conditional in that it requested summary judgment on Hanshaw's claims in the event that the trial court granted Crown's motion to exclude. Consequently, the procedural posture of the case asked the trial court whether to grant the motion to exclude, and, if so, whether to grant summary judgment to Crown on Hanshaw's claims. Conversely, if the trial court declined to grant the motion to exclude, then the only issue left for the trial court on Crown's motion for summary judgment would have been whether to grant summary judgment on the issue of punitive damages. Given the issues presented to the trial court, whether to grant the motion to exclude was logically the first issue for the trial court to assess.

9

Despite the majority's assertion to the contrary, Hanshaw's response to the motion to exclude did not include a single citation to B.R.'s deposition. Hanshaw's response did include a citation to B.R.'s affidavit with an explanation of the affidavit's importance to B.R.'s qualifications. Primarily, Hanshaw's citations to the record in his response to the motion to exclude were to the numbered paragraphs in his additional statement of facts that he submitted in the summary judgment record pursuant to Rule 74.04(c). Throughout the qualification portion of Hanshaw's response to the motion to exclude, Hanshaw cited to the numbered paragraphs in his additional statement of facts for factual propositions that could weigh on B.R.'s qualifications. In the reliability portion of Hanshaw's response, Hanshaw did not include any citations to any materials in the record. Then, in a portion arguing that B.R. should be permitted to offer alternative designs, Hanshaw included eight citations to his additional statement of material facts filed in his response to Crown's summary judgment motion. Of these eight citations, only four were related to B.R.'s deposition. One of the four related to an issue on which the majority and I do not disagree (the exclusion of B.R.'s opinion that the forklift was defective for a lack of a bumper).

The three remaining statements of fact to which Hanshaw cited in the portion of his response to the motion to exclude that could arguably be characterized as a discussion regarding reliability are as follows:

> 15. In 2015, [B.R.] obtained a Crown RC-3000 which he modified to include a door.
>
> . . . .

10

20. Installing a latching door on the RC5500 would improve the safety of the subject forklift.

21. Installing a spring-loaded door on the RC5500 would improve the safety of the subject forklift.

These stated facts indicate that B.R. had two opinions about the safety of the subject forklift and that B.R. had once attached a door to a different model of Crown forklift. Such assertions do not provide the trial court with a means to conclude that B.R.'s design-defect opinions were reliably formed.

The majority's assertion that Hanshaw's response to the motion to exclude cited to B.R.'s deposition is simply not correct as that document contains no citations to B.R.'s deposition. The majority apparently believes that a citation to deposition material in support of a numbered paragraph in a statement of facts offered in summary judgment proceedings pursuant to Rule 74.04(c) is in effect a citation to a deposition. However, this belief would require the majority to use the material cited in support of Hanshaw's Rule 74.04(c) numbered paragraphs for a purpose that is inappropriate for a trial court to do even in assessing summary judgment.

As is well-established, trial courts (and consequently appellate courts) determine the propriety of summary judgment based on the Rule 74.04(c) record of numbered paragraphs and responses and **not** the whole record before the trial court. *See Green v. Fotoohighiam*, 606 S.W.3d 113, 117 (Mo. banc 2020) (citation omitted). As is also well-established, materials cited in support of a numbered paragraph in a statement of facts play only a secondary role in determining the propriety of summary judgment, and then "only as cited to support Rule 74.04(c) numbered paragraphs or responses, *since parties*

11

*cannot cite or rely on facts outside the Rule 74.04(c) record.*" *Id.* (citation omitted) (emphasis in original). In other words, the materials cited in support may illuminate the factual proposition asserted in the numbered paragraphs but such secondary materials are not to be the independent source of new factual propositions in summary judgment proceedings. *See id.* at 117-118.

Although the procedural posture of the case necessarily presented the exclusion issue to the trial court prior to the issue of whether summary judgment on Hanshaw's claims was proper, I see no problem with Hanshaw citing, in his response to the motion to exclude, to the numbered paragraphs in his statement of facts in the summary judgment proceeding – at least insofar as the Rule 74.04(c) paragraphs were being cited for the factual propositions asserted in those paragraphs. However, even in summary judgment proceedings, the materials cited in support of Rule 74.04(c) numbered paragraphs are only to be considered secondarily and only "as cited to support Rule 74.04(c) numbered paragraphs or responses[.]" *Green* 606 S.W.3d at 117. In this matter, the majority loses sight of the limited purpose for which materials cited in support of Rule 74.04(c)'s numbered paragraphs may be used. In taking the position that a citation to a numbered paragraph is itself a citation to the material cited in support of such numbered paragraph, the majority takes the apparent position that any summary judgment materials cited in support of Rule 74.04(c) paragraphs must be considered in deciding motions other than summary judgment regardless of whether the use of such material for such purpose would be improper even in summary judgment proceedings. In other words, the majority takes the position that such summary judgment materials must be

12

used for a purpose in separate proceedings on a separate motion even though utilization of such materials in such a manner would be improper even in summary judgment proceedings.

But, even if we were to examine the citations to B.R.'s deposition in support of the factual assertions in the numbered paragraphs that were filed for summary judgment purposes, the deposition portions cited nevertheless failed to provide the trial court with material with which to assess whether B.R.'s opinions were reliably formed. In support of the facts asserted in paragraphs 20 and 21 of Hanshaw's additional statement of facts, Hanshaw cited to a portion of B.R.'s deposition that merely indicated that B.R. had the opinions asserted in those paragraphs. This deposition material obviously does not provide a basis for determining whether these opinions were reliably formed.

In support of the fact asserted in paragraph 15 ("In 2015, [B.R.] obtained a Crown RC-3000 which he modified to include a door."), Hanshaw cited to three portions of B.R.'s deposition that discussed that B.R. had attached a door to an RC-3000 forklift. One of the cited portions also included a reference to B.R. having conducted egress testing.[4] This material also does not provide a basis for assessing whether B.R.'s opinions were reliably formed.

_____

[4] In support of paragraph 15, Hanshaw cited to three portions of B.R.'s deposition – 57:10 to 59:23; 115:13-22; 116:5-19. Pages 57 through 59 contain no mention of egress testing. The remaining portions provide, in full:

> Q. And obviously you conducted the testing and operators getting off a truck from an open operator compartment and then you equipped the truck with a door; correct?
> A. Yes.
> Q. And what door did you put on the RC-3000 and give us your involvement in that process?

13

I want to be clear about the crux of the majority's efforts. The majority faults the trial court for not having independently scoured the 169 pages of B.R.'s deposition for the methodologies underlying B.R.'s opinions and the reasons why B.R.'s opinions may have been reliably formed. This is obvious because the majority opinion contains much discussion of deposition testimony to which the trial court was never directed by Hanshaw at any point (even if operating on the assumption that a citation to a numbered paragraph in a statement of facts was a citation to the materials cited in support of that factual proposition). Although I do not intend to suggest that motions to exclude be

---

A. It was a Raymond counterbalance truck door and I'm not sure what you mean by my involvement in the process.
. . . .
Q. Did it have to be retrofitted to fit the Crown truck?
A. I mean, it had to be fit to the Crown truck, but I was actually surprised, it was a pretty good fit.
Q. You didn't have to cut any metal or anything like that, I gather?
A. No.
Q. And was it a Raymond spring-loaded door?
A. Yes, it was. We also equipped the door with a latch, but it was a Raymond spring-loaded door.
Q. And what type of latch did you use?
A. We equipped it with kind of a crash bar latch.

The above is the full extent of the citations to B.R.'s deposition in support of paragraph 15. According to the majority, Hanshaw's citation to paragraph 15 constituted "specific citations to the portions of [B.R.]'s deposition in which he described the egress-time testing he had conducted to assess the forklift industry's claim that a rear compartment door would hinder operator exit in the event of a stability accident."

Even if the trial court were obligated (without any prompting by Hanshaw) to scour the entirety of B.R.'s deposition, B.R.'s deposition is lacking in the details and results of the egress testing that would allow the trial court to assess whether B.R.'s opinions had been reliably formed. The majority indicates that it is not relying on documents outside the record, yet is confident in B.R.'s assertions based on tests he conducted without the benefit of the details and results of such testing. The majority apparently takes the position that the details are irrelevant so long as a proposed expert has a conclusion and claims to have performed testing that supports it.

14

decided in an overly technical manner, it *is* necessary for the trial court to be a neutral arbiter rather than an advocate for either party. *See State v. Deweese*, 540 S.W.3d 490, 494 (Mo. App. W.D. 2018). Consequently, parties carrying the burden of establishing admissibility should at least be required to bring their arguments and evidence to the trial court's attention before expecting the trial court to independently discover such evidence and consider it in light of arguments and explanations that were not presented to the trial court.

Regarding B.R.'s affidavit, I agree that Hanshaw sufficiently directed the trial court's attention to the affidavit. B.R.'s response to the motion to exclude cited to the affidavit in discussing B.R.'s qualifications and indicated that the purpose of the affidavit was to add detail and explanation to B.R.'s curriculum vitae. Hanshaw argued that his CV and his affidavit would provide the information necessary for evaluating the qualifications of B.R. The affidavit contains a number of statements relevant to qualification.[5] However, the affidavit does not include material that would provide a basis for assessing whether B.R. had reliably formed the opinion that the subject forklift

---

[5] The majority suggests that the dissenting opinions "do not attempt to defend the circuit court's conclusion that [B.R.] was unqualified." As the majority knows, appellate courts must affirm the circuit court's judgment if it is correct on any ground supported by the record. *See Curtis v. Mo. Democratic Party*, 548 S.W.3d 909, 918 (Mo. banc 2018). As the majority also knows, it is a well-established principle that appellate courts avoid addressing issues that are immaterial to the resolution of the case before it. *See Seay v. Jones*, 439 S.W.3d 881, 895 (Mo. App. W.D. 2014). Because section 490.065.2 contains requirements regarding both qualification and reliability, the failure of a proponent to meet the reliability requirements is itself grounds for exclusion rendering an analysis regarding qualification unnecessary. I do not address the propriety of the trial court's conclusion regarding B.R.'s qualification (or lack thereof) to render his opinions, because addressing that issue is not necessary to correctly resolve the case before us and to thus affirm the trial court's judgment.

15

was defectively designed due to its open compartment. A statement at the end of the affidavit indicated that a PowerPoint presentation to detail B.R.'s opinions had been prepared and attached to the affidavit as an exhibit. However, no such PowerPoint exists in our record on appeal, and there is no indication in the record as to whether the trial court was ever provided with that material.

Regarding B.R.'s deposition, this deposition was submitted by Hanshaw as an exhibit to Hanshaw's additional statement of facts in his response to the summary judgment motion, which was filed the same day as Hanshaw's response to the motion to exclude. However, contrary to the majority's assertions, Hanshaw's response to the motion to exclude did not include a single citation to B.R.'s deposition. Moreover, much of the deposition testimony discussed in the majority opinion comes from portions of the deposition to which the trial court was never directed – not even if considering all of the materials cited in support of Hanshaw's 74.04(c) paragraphs.

In sum, the majority fails to properly consider the circumstances before the trial court. The majority faults the trial court for failing to discover materials that Hanshaw never cited in his presentation to the trial court, then for refraining from forming such uncited materials into a coherent presentation that Hanshaw never made. However, our appellate standard of review is not a *de novo* review based on the whole record but is instead acutely focused on the circumstances before the trial court. *See Shallow*, 554 S.W.3d at 881; *see also Rhoden v. Mo. Delta Med. Ctr.*, 621 S.W.3d 469, 484 (Mo. banc 2021) ("In determining whether the trial court abused its discretion in excluding evidence, the focus is not on whether the evidence was admissible but on whether the

16

trial court abused its discretion in excluding the evidence.").  Rather than adhering to the standard of review (whether the trial court abused its discretion in light of the circumstances before the trial court), the majority steps in where Hanshaw failed and cobbles together an argument in support of reliability that bears little resemblance to the presentation made to the trial court.

## IV.

The trial court determined that Hanshaw failed to carry the burden of establishing that B.R.'s design-defect opinions were reliable.  This ruling was not an abuse of discretion.

Regarding reliability, the trial court noted the testing that B.R. had performed and the testing that B.R. had not performed.  Regarding the testing B.R. had performed, the trial court noted that B.R. "ha[d] not shown the reliability of this testing and how it relates to and supports his proffered designs."  The trial court then continued to assess whether B.R.'s opinions were reliably formed in the final paragraph of its reliability analysis before its conclusion:

> Plaintiff notes [B.R.] published peer reviewed papers related to forklift design, including a paper specifically addressing the forklift at issue here and a technical paper on forklift safety.  However, Plaintiff provided no indication these papers were relevant to or supported [B.R.]'s opinions at issue here.  Plaintiff contends for this case, [B.R.] analyzed Crown's accident data reported by Crown and OSHA data regarding accidents and injuries and used this information in developing his opinions, but he did not demonstrate how he used the data, how the data supported his opinions, and whether his use of the data was acceptable in the scientific community. Failure to thoroughly explain methodology to support expert opinion weighs in favor of exclusion. *Gebhardt v. Am. Honda Motor Co.*, 627 S.W.3d 37, 45 (Mo. Ct. App. 2021) (speculative foundation and lack of confirmatory testing, third-party validation or other facts and data

17

buttressing the reliability of the methods applied or conclusions is a sufficient basis to exclude); *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 870 (7th Cir. 2001) (without a detailed explanation of methodology, a court cannot assess the reliability of the testimony).

In other words, despite the majority opinion's unfounded conclusion regarding the "primary basis" for the trial court's ruling, the trial court's ruling was clearly based in large part on the trial court's inability to determine from the materials before it whether B.R.'s opinions were reliably formed. The trial court's ruling was supported by the record and was not an abuse of discretion.

The majority nevertheless takes the apparent position that the trial court was required to assume that B.R.'s opinions were reliably formed based on testing B.R. claimed to have performed without indication in the record before the trial court as to whether that testing was reliably conducted and without explanation as to the relevance of such testing. The majority also takes the apparent position that the trial court was required to assume that Hanshaw's opinions based on data were reliably formed even though the record does not support this conclusion. In other words, with respect to the testing and data purportedly relied on by Hanshaw, the majority takes the apparent position that B.R.'s conclusions are reliably produced because B.R. says they were. However, this position is unfounded. *See, e.g., Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 157 (1999) ("Of course, Carlson himself claimed that his method was accurate, but, as we pointed out in *Joiner*, nothing in either *Daubert* or the Federal Rules of Evidence

18

requires a district court to admit opinion evidence that is connected to existing data only by the *ipse dixit* of the expert.") (internal quotations omitted).[6]

Regarding the testing conducted by B.R., the trial court correctly recognized that B.R. had not shown the reliability of such testing. The majority criticizes Crown's assertions regarding B.R.'s egress time article. But, as the majority knows, Hanshaw made no attempt to put that article before the trial court. Nevertheless, the majority makes assertions regarding what that article did and did not study and even makes assertions about that article's similarity to other studies. In doing so, the majority assumes the study was reliably conducted, and that it reliably supported the conclusion that B.R. asserted it did. However, the only support the majority has for these propositions are the assertions of B.R. The trial court was not required to blindly accept B.R.'s assertions regarding the reliability of his methodologies. *See Kumho Tire*, 526 U.S. at 157.

---

[6] To be clear, there were reasons for the trial court to be vigilant regarding the principles and methodologies underlying B.R.'s opinions. Although the majority is correct that industry and regulatory standards are not dispositive considerations, whether an expert's theory is generally accepted in the relevant community is regularly cited as a relevant consideration in assessing reliability. *See State v. Marshall*, 596 S.W.3d 156, 160 (Mo. App. W.D. 2020) (citation omitted). Here, the record indicates that B.R.'s opinions clashed with the safety recommendations of a private standard-setting society of mechanical engineers as well as guidance provided by OSHA. Granted, the reliability inquiry focuses on the principles and methodology underlying a conclusion rather than the conclusion generated; however, it has been recognized that conclusions and methodologies are not entirely distinct, such that trial courts may fairly suspect that a conclusion has not been reliably formed when a proposed expert reaches a conclusion contrary to that of other experts in the field. *See* Advisory Committee Notes, Fed. R. Evid. 702 (2000) (citations omitted).

Regarding B.R.'s conclusions based on data, the majority suggests that B.R.'s reviews of data were "detailed" and "comprehensive" and that B.R.'s opinions based on this data were reliably formed. However, the data purportedly utilized by B.R. is not contained in the record on appeal, thus making it impossible (for the trial court or the majority) to determine whether B.R. reliably formed his opinions based on data.

For example, the majority asserts that B.R.'s data analysis focused on publicly available data from OSHA, and that B.R.'s review of this data indicated that 76% of lower limb injuries are caused by the operator's leg inadvertently exiting the operator compartment. However, nothing in the record indicated that this conclusion was reliably formed. To be clear, this statistic is ***not*** an OSHA statistic, but a statistic that was created by B.R. based on assumptions and undisclosed subsets of data that were apparently drawn from OSHA's database in accordance with an undisclosed methodology.

B.R. testified at his deposition that the 76% statistic regarding injuries being the result of a limb being inadvertently out of the operator compartment was based on B.R.'s *assumption* that 100% of the injuries involving a limb being outside the operator compartment involved inadvertency. Further, B.R. testified that the 76% calculation was his own determination based on his own review of reports based on undisclosed searches he conducted rather than being anything from OSHA's database.[7] In asserting that this

---

[7] Regarding B.R.'s 76% statistic, the following exchange took place at B.R.'s deposition:

> Q. [I]s the basis for that calculation, is that anything within OSHA's database or in OSHA's statement or is that just purely you went through the reports and made that calculation yourself?

conclusion is reliable based solely on B.R.'s assertions that he reviewed information, the majority takes the apparent position that trial courts are required to accept whatever conclusions a proposed expert offers so long as the proposed expert claims the conclusions are based on data – even where that data may not exist anywhere outside of the proposed expert's mind.  The trial court is not required to do so.  *See Kumho Tire*, 526 U.S. at 157.

The majority belabors the point that B.R. was not required to design or test an alternative design.  But it is an unavoidable fact that Hanshaw expressly argued to the trial court that B.R. should be permitted to testify regarding safer alternative designs. Hanshaw also informed the trial court that B.R. opined that a door would improve the "overall safety" of the subject forklift.   It is unwarranted for the majority to criticize the trial court for assessing what testing had and had not been performed, given that whether a theory has been tested is regularly recognized as being a relevant factor in assessing reliability.  *See, e.g., State v. Marshall*, 596 S.W.3d 156, 160 (Mo. App. W.D. 2020) (citation omitted).[8]  It is particularly unwarranted for the majority to criticize the trial

---

A. It's the latter half of your question.  I've gone through the OSHA reports, that's my determination, that's not OSHA's calculation.

Q. OSHA never says 76 percent of lower limb injuries are related to inadvertently moving your leg out of the compartment; correct?

A. I'm unaware of that OSHA statement, no.

[8] The majority seems convinced that B.R. reliably formed the conclusion that tip-over accidents involving an 8,000 lb. forklift "are not very severe accidents in terms of the acceleration and the forces applied to the operator[.]"  However, B.R. acknowledged at his deposition that he had never conducted any testing involving tipping over a forklift to measure forces.

21

court for assessing what testing B.R. had and had not conducted in light of the opinions that Hanshaw directly informed the court that B.R. *would* offer. In other words, the majority again loses sight of the circumstances before the trial court, and, in doing so, loses sight of the abuse of discretion standard. *See Shallow*, 554 S.W.3d at 881.

The trial court did not abuse its discretion in determining that Hanshaw failed to satisfy the burden of establishing that B.R.'s opinions were reliably produced. Thus, the trial court did not err in granting the motion to exclude.[9]

## Conclusion

For these reasons, I would affirm the judgment of the trial court.

_____
Thomas N. Chapman, Judge

---

[9] Hanshaw's points on appeal were each dependent on establishing error with respect to the motion to exclude. Because Hanshaw failed to establish error regarding the trial court's grant of the motion to exclude, it is unnecessary to discuss Hanshaw's other points on appeal.

22